IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 7, 2009 Session

## STATE OF TENNESSEE v. JOEY DEWAYNE THOMPSON

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Knox County
No. 73384     Ray L. Jenkins, Judge**

**No. E2006-02093-SC-R11-CD -** Filed May 6, 2009

The defendant was initially charged with premeditated first degree murder and felony murder of one victim (Counts I and II in the indictment) and the attempted first degree murder of a second victim (Count III). He was found guilty of the lesser-included offense of second degree murder on the first count, a mistrial resulted on the second count, and, as to the third count, the jury acquitted the defendant on the primary charge but returned a guilty verdict of attempted second degree murder, a lesser-included offense. On direct appeal, the Court of Criminal Appeals, because of error in the instructions to the jury, reversed the convictions on Counts I and III and remanded for a new trial. Prior to the second trial, the State voluntarily dismissed Count III, the attempted second degree murder charge, and prosecuted the defendant only on Count I, for second degree murder, and Count II, for felony murder, both of the first victim. After the jury returned verdicts for the lesser-included offenses of voluntary manslaughter on Count I and second degree murder on Count II, the trial court imposed sentence and merged the two convictions. The defendant appealed, contending that because the prior jury had in effect returned a verdict of acquittal on the attempted first degree murder of the second victim, and because the alleged attempted first degree murder was the only possible predicate offense to support the felony murder charge in the retrial, the trial court had erred by allowing the felony murder charge to go to trial. The Court of Criminal Appeals affirmed the conviction. Because collateral estoppel, as a corollary in criminal cases of the constitutional protection against double jeopardy, precludes a guilty verdict on the requisite predicate offense for felony murder, we must reverse and dismiss the second degree murder conviction as a lesser-included offense of the improper primary charge. Otherwise, the judgment of the Court of Criminal Appeals upholding the conviction and sentence for voluntary manslaughter is affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed in Part and
Affirmed in Part**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a concurring opinion.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Joey Dewayne Thompson.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; John H. Bledsoe and Cameron L. Hyder, Assistant Attorneys General; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On June 23, 2001, Latoya Robinson ("Robinson"), was shot and killed, and her boyfriend, Travis Burgins ("Burgins"), was seriously injured. While driving a Buick LaSabre on McPherson Street in Knoxville near its intersection with Texas Avenue, Robinson suffered two bullet wounds to her lower right leg, one to her right forearm, and one to her right thigh. The fatal shot, however, passed through her upper right arm and into the chest, breaking ribs and piercing the heart and both lungs before passing through the left side of her body. Burgins sustained one gunshot wound to his left leg, which fractured his thigh, and four wounds to his right leg.

### Procedural and Factual History

A detailed summary of the procedural and factual history of the case is in order. Joey Dewayne Thompson (the "Defendant") was initially charged with the premeditated first degree murder of Robinson and the attempted first degree murder of Burgins. Later, the State also charged the Defendant with the first degree felony murder of Robinson, a charge predicated upon the attempt to commit the first degree murder of Burgins. The Defendant was tried in April of 2002 and convicted of two crimes: the second degree murder of Robinson, as a lesser-included offense to the charge of premeditated first degree murder (Count I); and the attempted second degree murder of Burgins, as a lesser-included offense to the charge of attempted first degree murder (Count III). Because the jury was unable to reach a verdict on the first degree felony murder charge (Count II), a mistrial was declared.

On the direct appeal of the two convictions, the Court of Criminal Appeals reversed, finding that the trial court had failed to provide adequate instructions to the jury by completely omitting a portion of the statutory definition of "knowing," an essential element as to each of the crimes.[1] See

---

[1] The United States Constitution and that of the State of Tennessee guarantee a right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6 (providing "that the right of trial by jury shall remain inviolate"). This right encompasses an entitlement to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 918 S.W.2d 431, 447 (Tenn. 1995); see also Tenn. R. Crim. P. 30. In consequence, "each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000).

The constitutional right to a complete instruction on the law requires trial courts to charge juries on each and every lesser-included offense. State v. Burns, 6 S.W.3d 453 (Tenn. 1999). In State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001), this Court ruled that the right to instructions on lesser-included offenses had foundations in both statute and our constitution. Id. at 727. Recently, this Court upheld these principles in the context of a challenge to the validity of an instruction requiring a jury to first acquit on the primary charge before considering any lesser offenses. State v. Davis,

(continued...)

-2-

Tenn. Code Ann. § 39-11-106(a)(20) (1997); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). A new trial was ordered. State v. Thompson, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817 (Tenn. Crim. App. July 16, 2004). The State did not file an application for permission to appeal.

After the remand to the trial court, the Defendant filed a motion to strike the pending first degree felony murder count from the indictment. The Defendant contended that because the conviction on the lesser charge of attempted second degree murder of Burgins served as an acquittal on the primary charge of attempted first degree murder of Burgins, and because attempted second degree murder was not among the statutory list of predicate felonies necessary for a charge of felony murder,[2] the State was barred by collateral estoppel and principles of double jeopardy from prosecuting on that count in the indictment. Although the trial court denied the motion to strike the felony murder count, the State, on the eve of the second trial, filed a nolle prosequi on the attempted second degree murder of Burgins. Thus, the State prosecuted on two counts: Count I, for the second degree murder of Robinson and Count II, for her felony murder.

Carol Wright Pfefferle, a dispatcher at the 911 center, was the first witness for the State in the second trial. She testified that at approximately 5:00 p.m. on June 23, 2001, she received a telephone call from an unidentified caller reporting a shooting. The audiotape of the conversation was played for the jury. The caller reported that a black man had thrown his hands up, pulled a weapon from his shorts pocket, and "unloaded his gun" into a vehicle.

Julian Dixon, who lived on Texas Avenue near the scene of the crime, was also a State witness. On the afternoon of the shooting, he noticed a small black car come to a stop on McPherson Street near its intersection with Texas Avenue. When a second car approached from behind the black car, he saw the Defendant, whom he had known "all his life," step from the curb into the street and trot in the direction of the second vehicle. According to Dixon, the Defendant had "a pistol down at his thigh." As the black car was driven away, the Defendant began to fire shots into the passenger side of the second vehicle. Dixon testified that the vehicle lurched forward and the Defendant followed alongside, firing seven to ten shots from three to four feet away. The shooting stopped when the car traveled beyond Dixon's range of vision, but the Defendant, who was still on foot, returned into view and then went "back across Texas [Avenue]."

At the time of the shooting, Shirley King, who was with her husband and three grandchildren on the porch of her residence at the corner of McPherson Street and Ohio Avenue, heard gunshots, pushed her grandchildren inside, and telephoned the police. When she looked out of her window,

---

[1](...continued)
266 S.W.3d 896, 901 (Tenn. 2008).

[2] Tenn. Code Ann. § 39-13-202. First degree murder. – (a) First degree murder is:
(1) A premeditated and intentional killing of another;
(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . .

she observed the car occupied by the two victims traveling slowly toward her yard. The man inside used his left hand to push the woman off the steering wheel in order to stop the vehicle. King, still on her cordless telephone with the police, hurriedly went outside with her husband. When she asked Burgins who had fired the shots, he answered, "Thug shot me." King, who was unfamiliar with the name "Thug," did not see any weapons inside the car at the time. She testified that Robinson, who had wounds to her side, her legs, and her arm, was unable to talk and apparently died before the ambulance arrived.

Dr. Brian Daley, a specialist in general surgery in the critical care unit at the University of Tennessee Medical Center, treated Burgins upon his arrival at the hospital. He found four wounds on the outside of Burgins' right leg with matching "marks" on the inside of the right leg and one wound just above the left knee. According to Dr. Daley, Burgins, who was able to communicate during the course of his treatment, initially identified himself as Tyran Begin. None of Burgins' wounds were life threatening.

Dr. Sandra Elkins, the chief medical examiner for Knox County, performed an autopsy on Robinson. She testified that Robinson was shot five times and grazed by a sixth bullet. One of the bullets, which caused the most serious of the wounds, entered her upper right arm and passed through the arm and into her chest just below the armpit, fracturing one rib on the right side and one on the left. The bullet passed through the right lung, the heart, and the left lung before exiting the left side of the body. According to Dr. Elkins, a second shot fractured the right forearm, the third shot entered the right thigh and lodged in the soft tissue behind the lower spine causing a fracture of the right pelvis. Two other gunshot wounds were to the right leg below the knee.

Knoxville Police Officer Gerald Smith, who investigated the crime scene within minutes of the shooting, discovered nine spent 9 mm cartridges, all of which were later determined to have been fired from the same weapon. The cartridges were located on McPherson Street at Texas Avenue over a distance of some 240 square feet. The passenger side window of the victims' Buick LeSabre, which was partially rolled down, was shattered by a single bullet. While investigating the scene, Officer Smith did not notice a weapon in the vehicle. Afterward, however, the Buick was towed for a more extensive search and inventory of the contents. At the impound lot, Officer Smith found a "Beretta, caliber nine short . . . better known as a 380," underneath the front seat on the passenger side. A magazine for the gun containing eleven rounds was found on the front seat of the vehicle underneath a CD case. Officer Smith did not find any usable latent fingerprints on the Beretta. There were two spent bullets on the driver's side of the vehicle and another on the floor on the driver's side. The Defendant's weapon was apparently never recovered.

Steve Scott, a forensic scientist at the crime laboratory at the Tennessee Bureau of Investigation, examined the pistol found in the Buick LaSabre, the nine cartridge cases found in the street, the three bullets in the vehicle, and the one bullet removed from Robinson. He determined that the nine cartridge cases had been fired from a 9 mm automatic pistol. An examination of three of the bullets, one taken from the body and two taken from the vehicle, indicated that all had been fired through the barrel of a single 9 mm pistol, and not the Beretta. As to the fourth bullet, the

-4-

copper jacket had separated, and only the lead core remained; therefore, Agent Scott was unable to determine the origin of the bullet because there were no markings.

Todd Smith, a federal agent with the Bureau of Alcohol, Tobacco and Firearms, was a patrol officer with the Knoxville Police Department at the time of the shooting. When he arrived at the scene, Agent Smith asked Burgins who fired the shots. Burgins answered, "Joe, Thug." When he asked whether this was "Amo Wright's brother, Joey Thompson," Burgins answered, "Yes." According to Agent Smith, Robinson had a "very, very weak pulse" when he arrived and "almost no respiration." He recalled that Burgins informed him that the Defendant ran at their car, displayed a pistol, and then fired several shots into the vehicle.

Eric Reeves, also an officer with the Knoxville Police Department, knew the Defendant prior to the shooting and had given him his pager number. Unaware that there had been a shooting, Officer Reeves received a page from the Defendant and then called him. The Defendant, who sounded nervous and asked if "the girl" was okay, explained that he had a problem with Burgins, who had shot at his brother. During the conversation, Officer Reeves turned on his radio and learned that the Defendant was a suspect in a shooting. After "back and forth" calls, the officer encouraged the Defendant to turn himself in to the police. Although the Defendant agreed to do so, he failed to appear at the designated location and also failed to show at a second location. On the following day, however, he did meet Officer Reeves at the police department.

After the State rested its case, the defense called Burgins, who had testified for the State in the first trial, as its initial witness. Although Burgins admitted that he and the Defendant's brother, Amo Wright, had a confrontation shortly before the shooting, he believed that everything was "cool" between them. When he saw the Defendant a few minutes later, Burgins flashed a peace sign and, he claimed, the Defendant responded in kind. Burgins denied anticipating any trouble until he heard a click from a gun as the Defendant was "jogging" towards his vehicle and the black car began to move. Burgins testified that the Defendant had placed about one-half of the barrel of his gun into the car when the first shots were discharged. While acknowledging that the Defendant was not looking into the car during the gunfire, Burgins estimated that the Defendant shot inside some ten times. Although he was aware that the police found a gun in his car at the impound lot, Burgins denied that it was his. He speculated that "somebody threw it in there." He also denied that there were drugs in the vehicle. Burgins, whose testimony was often conflicting, also denied that he had testified at the preliminary hearing that the first bullet struck Robinson in the head. When confronted with the transcript of the hearing, he said, "I ain't never say that . . . . [t]hat's wrong." On cross-examination by the State, Burgins acknowledged that he had been charged with criminal impersonation several times for "giv[ing] a fake name to the police."

The Defendant, who testified on his own behalf, acknowledged that some had called him "Joe Thug" since he was about ten years old. He explained that he had big eyes as a child and his friends called him "Joe Bug," which eventually became "Joe Thug." He stated that his half-brother, Amo Wright, dated Robinson for about a year and a half. He described the relationship between the two as "rough." The Defendant claimed that their relationship continued even after Robinson began

to date Burgins, whom the Defendant had known all of his life. He explained that his brother telephoned him just before the shooting claiming that he had been threatened with a gun by Burgins. While insisting that he had no prior issues with Burgins, the Defendant admitted that his brother had experienced difficulties with Burgins. The Defendant acknowledged that he armed himself after receiving the call from his brother, contending that Burgins always carried a gun. The Defendant claimed that as he approached the passenger side of the vehicle, Burgins was "pointing a gun at my direction." He asserted that Robinson was "slumped over" when he pulled his gun and ordered Burgins to "drop it." The Defendant explained that he had no intention of shooting Robinson and had aimed for Burgins' legs so he "wouldn't kill him . . . ."

Officer Gerald Smith was recalled to testify for the defense. He confirmed that he had recovered the gun from the Defendant's vehicle, a magazine, and some bullets. He acknowledged that he also found a small bag of marijuana in the interior handle of the passenger side at the front door. A plastic cigar tube in the middle of the front seat contained "four crack rocks."

After completing their deliberations, the jury returned verdicts of guilt for voluntary manslaughter on Count I and second degree murder on Count II. The trial court imposed sentences of twenty and six years respectively, and then merged the offenses into a single judgment of conviction.[3]

On direct appeal, the Court of Criminal Appeals upheld the sufficiency of the convicting evidence and rejected the claim by the Defendant that the verdict of second degree murder for the death of Robinson should be set aside as inconsistent with the voluntary manslaughter verdict. Placing some significance on the fact that protections against double jeopardy do not bar convictions for both felony murder and its predicate offense,[4] the Court ruled that prosecution of the felony murder charge, which resulted in the second degree murder conviction, was not barred by the doctrine of collateral estoppel. Because the court concluded that the mistrial in the first trial on the felony murder charge had extended the prosecution, it refused to classify the acquittal on the attempted first degree murder as a "prior suit" for collateral estoppel purposes. The Court of Criminal Appeals distinguished the holding of the United States Supreme Court in Ashe v. Swenson, 397 U.S. 436 (1970), ruling that the mistrial in the felony murder "prolong[ed] the prosecution through another trial . . . [rather than] transform[ing] it into a 'subsequent' prosecution. The three counts were launched together in the stream of this prosecution, and we do not deem the acquittal on the attempt to commit first degree murder as a 'prior suit' for collateral estoppel purposes." State

---

[3] Our law provides for the merger of dual convictions for first degree premeditated murder (or its lesser-included offenses) and first degree felony murder (or its lesser-included offenses): "Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction . . . ." State v. Cribs, 967 S.W.2d 773, 788 (Tenn. 1998); Carter v. State, 958 S.W.2d 620, 624 n.6 (Tenn. 1997).

[4] In State v. Ralph, 6 S.W.3d 251, 256 (Tenn. 1999), this Court confirmed that "when legislative intent is clear, a defendant may be separately convicted of two offenses which arise from one criminal transaction."

v. Thompson, No. E2006-02093-CCA-R3-CD, 2008 WL 465269, at *8 (Tenn. Crim. App. Feb. 21, 2008).

This Court granted the application for permission to appeal to consider whether the acquittal on the charge of attempted first degree murder in the first trial was final and whether collateral estoppel, as grounded in federal and state constitutional protections against double jeopardy, applies to these circumstances. Our standard of review for mixed questions of law and fact is de novo without any presumption of correctness. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001).

**Double Jeopardy and Collateral Estoppel**

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.[5] Similarly, article 1, section 10 of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10.[6] In State v. Pennington, 952 S.W.2d 420 (Tenn. 1997), we explained that

> double jeopardy violations arise *only* when an individual is twice placed in jeopardy for the same offense. Customarily, in jury proceedings, jeopardy attaches when the jury is sworn, and in nonjury proceedings, jeopardy attaches when the first witness testifies. A defendant must be put in jeopardy at least once, "for only if that point has once been reached does any subsequent prosecution of the defendant bring the guarantee against double jeopardy even potentially into play."

Id. at 422 (quoting Crist v. Bretz, 437 U.S. 28, 32-33 (1978)) (citations omitted). Three fundamental protections are encompassed in the principle of double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." Denton, 938 S.W.2d at 378 (citations and footnote omitted); see also State v. Pickett, 211 S.W.3d 696, 705 (Tenn. 2007). The policy underlying double jeopardy is that the State, with all of its resources, should not be able "to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even [when] innocent he may be found guilty." State v. Smith, 871 S.W.2d 667, 671 (Tenn. 1994) (quoting Green v. United States, 355 U.S. 184,

---

[5] The Fifth Amendment guarantee against double jeopardy is enforceable against the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784 (1969).

[6] Although our application of article 1, section 10 is sometimes "guided in part" by precedents construing the similar federal constitutional provision, these federal precedents are "useful" but "not conclusive." State v. Denton, 938 S.W.2d 373, 379 (Tenn. 1996) (discussing the role of Blockburger v. United States, 284 U.S. 299 (1932), in application of State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975)). The double jeopardy clauses of the United States and Tennessee constitutions are distinct, independent protections that, at times, differ in their details. See State v. Stephenson, 195 S.W.3d 574, 586-88 (considering double jeopardy claims under the federal and Tennessee constitutions separately).

187-88 (1957)); see also Daniel K. Mayers & Fletcher L. Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1, 32 (1963).[7]

While double jeopardy applies in the context of criminal law, collateral estoppel has its origins in civil litigation, as addressed by the Supreme Court in Cromwell v. Sac County, 94 U.S. 351, 353 (1876). 1B James Wm. Moore, Federal Practice ¶ 0.418[1], p. 2701 (2d ed.).[8] Collateral estoppel became a part of the federal criminal law in 1916: "the safeguards of the person, so often and so rightly mentioned with solemn reverence, [cannot be] less than those that protect from a liability in debt." United States v. Oppenheimer, 242 U.S. 85, 87 (1916). In Ashe v. Swenson, 397 U.S. at 443, perhaps the leading case on the subject, the Supreme Court defined collateral estoppel to mean that when an issue of fact has been determined by a valid and final judgment, it may not be litigated by the same parties in any future litigation. Describing the doctrine as an "established rule of federal law," the Supreme Court classified its application as "embodied in the Fifth Amendment guarantee against double jeopardy." Id. at 445. While warning that a careful scrutiny of the record in a prior adjudication is essential in order to determine "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration," the Court ruled that an acquittal by a general jury verdict might bar altogether any subsequent prosecution. Id. at 444 (footnote omitted). In assessing whether collateral estoppel applies in a given situation, courts must, therefore, consider the indictment and pleadings, the evidence, the instructions to the jury, and any other relevant matter "in a practical frame and viewed with an eye to all the circumstances of the proceedings." Id. (quoting Sealfon v. United States, 332 U.S. 575, 579 (1948)). The burden is on the party asserting collateral estoppel to demonstrate that a specific point at issue has been previously and finally decided. See United States v. Bailey, 34 F.3d 683, 688 (8th Cir. 1994); see also United States v. Vaughn, 80 F.3d 549, 551 (D.C. Cir. 1996).

In Massengill v. Scott, 738 S.W.2d 629 (Tenn. 1987), this Court, in a civil suit, compared collateral estoppel to the doctrine of res judicata:

---

[7] In Richardson v. United States, 468 U.S. 317, 325 (1984), the Supreme Court observed that a mistrial based upon a deadlocked jury does not end jeopardy.

[8]
> [W]here [a] second action between the same parties is upon a different claim . . . the judgment in the prior action operates as an estoppel only as to those matters in issue . . . upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point . . . actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.

Cromwell, 94 U.S. at 353. In other words, "the judgment on the first suit operates as collateral estoppel as to, but only to, those matters . . . which were in issue . . . and upon the determination of which the initial judgment necessarily depended." Id.

The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit.

Id. at 631. In the context of a civil case, collateral estoppel (also known as issue preclusion) has been described as an extension of the doctrine of res judicata (also known as claim preclusion) and applicable only when "it affirmatively appears that the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment . . . ." Id. at 631-32. In Gibson v. Trant, 58 S.W.3d 103 (Tenn. 2001), this Court cited the promotion of finality in the litigation, the conservation of judicial resources, and the prevention of inconsistent decisions as policy considerations warranting the application of collateral estoppel in civil litigation. Id. at 113; see also Standefer v. United States, 447 U.S. 10, 23, n.18 (1980) (stating that the policy behind the doctrine lies in the inherent reliability of final judgments). Like the federal courts, this Court has held that the party seeking to invoke collateral estoppel as a bar to litigation "has the burden of proving that the issue was, in fact, determined in a prior suit between the same parties and that the issue's determination was necessary to the judgment." Dickerson v. Godfrey, 825 S.W.2d 692, 694 (Tenn. 1992); see also Home Ins. Co. v. Leinart, 698 S.W.2d 335, 336 (Tenn. 1985). A final judgment is essential under either collateral estoppel or res judicata. Richardson v. Tenn. Bd. Of Dentistry, 913 S.W.2d 446, 459 (Tenn. 1995).

Collateral estoppel had its beginnings in civil litigation in the federal courts, developed into the criminal law, and, during the last thirty-five years, has come to be recognized as grounded in the constitutional protection against double jeopardy in criminal cases. In Tennessee, the doctrine has a similar history, having been recognized as a part of our criminal jurisprudence for a relatively short period of time. See, e.g., State v. McKennon, 6 S.W.3d 508, 511 (Tenn. Crim. App. 1998) (holding that the defendant bears the burden of showing that the precluded issue was decided and necessary to the judgment in the first trial); State v. Vickers, 985 S.W.2d 1, 7 (Tenn. Crim. App. 1997) (explaining that collateral estoppel may bar a later prosecution for a separate offense if an issue of ultimate fact has been determined by a final judgment); State v. Allen, 752 S.W.2d 515 (Tenn. Crim. App. 1987) (holding that because there was no prior acquittal or adverse determination to the state, collateral estoppel does not apply). Recently, in State v. Scarbrough, 181 S.W.3d 650 (Tenn. 2005), a case in which this Court, following federal precedent as well as the rule adopted in several other states, refused to permit a prior, final conviction of aggravated burglary to be used "offensively" by the prosecution as the predicate offense in the retrial of a felony murder charge, we specifically acknowledged that collateral estoppel may nevertheless apply in the defense of a criminal case as the embodiment of the "guarantee against double jeopardy." Id. at 655 (quoting Ashe v. Swenson, 397 U.S. at 445). In making a distinction between the "offensive" use of the doctrine versus its application as a defense to a particular charge, we held that the accused's right to a jury embodies the entitlement "to have every fact tried and determined by twelve jurors and to have all issues of fact submitted to the same jury at the same time" and trumps policy considerations for finality and

consistency in a criminal proceeding when the prosecution asserts its application. Scarbrough, 181 S.W.3d at 655 (quoting State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997)). The United States Supreme Court had previously made this same distinction, holding that collateral estoppel, while permitted as a defense, may not be used offensively so as to excuse the prosecution "from proving the same facts the second time." United States v. Dixon, 509 U.S. 688, 710 n.15 (1993). A number of federal cases have ruled similarly, having observed that the liberty interests of an accused, in such instances, "take[] priority over the usual concerns for efficient judicial administration . . . ." United States v. Pelullo, 14 F.3d 881, 893 (3d Cir. 1994); see also United States v. Gallardo-Mendez, 150 F.3d 1240, 1244 (10th Cir. 1998). In summary, while collateral estoppel is available in the defense of a prosecution, the doctrine may not be used as an offensive weapon against the defendant in a criminal case. United States v. Smith-Baltiher, 424 F.3d 913, 920 (9th Cir. 2005).[9]

**Analysis**

Because the proof offered by the State is clearly sufficient to support convictions of either voluntary manslaughter or second degree murder and because, in general, an inconsistency in multiple count verdicts in a criminal prosecution is not a basis for relief,[10] the single question presented in this case is whether collateral estoppel applies as a bar to the prosecution of the felony murder charge in Count II. The Defendant asserts that his acquittal of attempted first degree murder in the first trial had become final by the retrial on the felony murder charge; he argues, therefore, that the doctrine of collateral estoppel, as founded upon principles protecting against double jeopardy, precludes reconsideration of the issue as an essential element of the felony murder prosecution. Some background information on two of the leading cases on this subject by the United States Supreme Court may be helpful in our resolution of this question.

In Ashe v. Swenson, Ashe, who was one of four masked individuals charged with the armed robbery of six poker players, was indicted on six separate counts of armed robbery. Of the four poker players who testified, two thought that there were only three robbers and could not identify Ashe. A third player, who was related to Ashe by marriage, could positively identify the other three robbers but could only say that Ashe's voice sounded like that of one of the robbers. A fourth poker

---

[9] In State v. Ingenito, 432 A.2d 912 (N.J. 1981), the New Jersey Supreme Court refused to apply offensive collateral estoppel because the doctrine "constitutes a strong, perhaps irresistible, gravitational pull towards a guilty verdict, which is utterly inconsistent with requirement that a jury remain free and untrammeled in its deliberations." Id. at 918-19. Even though there had been a jury in the prior proceeding, the Ingenito court concluded that the accused's right to a jury required the same jury to consider each of the essential issues to a guilty verdict. See also People v. Goss, 521 N.W.2d 312, 316 (Mich. 1994) (estopping the accused from contesting the armed robbery element of a felony murder charge would preclude an independent evaluation by the second jury). Although the situation is rare, this appears to be the general rule among the states.

[10] In Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973), a case involving a multi-count indictment stemming from the same criminal transaction, a jury acquitted the two defendants of petit larceny, but returned guilty verdicts on charges of concealing stolen property. This Court ruled that consistency between verdicts on separate counts of an indictment tried simultaneously is not necessary. Id. (citing Dunn v. United States, 284 U.S. 390, 393 (1932) ("[I]n such cases . . . the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.")).

-10-

player identified Ashe only by his size, his height, and his mannerisms. Defense counsel challenged only the identification of Ashe as a participant in the crime. The jury returned a general verdict of not guilty "due to insufficient evidence." Ashe v. Swenson, 397 U.S. at 439. Six weeks later, Ashe was brought to trial for the robbery of a second poker player. A motion to dismiss based upon the prior acquittal was overruled. At trial, the pertinent facts were as follows:

> The witnesses were for the most part the same, though this time their testimony was substantially stronger on the issue of [Ashe's] identity. For example, two witnesses who at the first trial had been wholly unable to identify [Ashe] as one of the robbers, . . . testified that his features, size, and mannerisms matched those of one of their assailants. Another witness who before had identified [Ashe] only by his size and actions now also remembered him by the unusual sound of his voice. The State further refined its case at the second trial by declining to call one of the participants in the poker game whose identification testimony at the first trial had been conspicuously negative.

Id. at 440. At the conclusion of the trial, Ashe was found guilty and sentenced to thirty-five years. The Missouri Supreme Court affirmed the conviction, holding no former jeopardy violation. State v. Ashe, 350 S.W.2d 768, 771 (Mo. 1961). A post-conviction attack was unsuccessful. State v. Ashe, 403 S.W.2d 589 (Mo. 1966). After the federal district court denied habeas corpus relief, the Eighth Circuit Court of Appeals affirmed. The Supreme Court, however, granted certiorari and concluded from the record of the prior trial that the "single rationally conceivable issue in dispute before the jury was whether [Ashe] had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery . . . wholly impermissible." Ashe v. Swenson, 397 U.S. at 445. Because the first jury, by its verdict, had rejected the claim that Ashe was one of the robbers, the Supreme Court held that the State could not "constitutionally hail him before a new jury to litigate that issue again." Id. at 446.

Similarly, in Turner v. Arkansas, 407 U.S. 366 (1972), the United States Supreme Court confirmed that the doctrine of collateral estoppel in criminal cases was grounded upon principles of double jeopardy. Because Turner had been acquitted in the jury's general verdict on a charge of both first degree premeditated murder and felony murder based upon a robbery as the predicate offense, a subsequent prosecution on the robbery charge was barred on constitutional grounds. The Court examined the entire record of the first trial, specifically the instructions by the trial judge; because Turner had been charged with criminal responsibility for the murder only as an accomplice and not as the principal offender, the Court decided that the "only logical conclusion [was] that the jury found [Turner] not present at the scene of the murder and robbery, a finding that negate[d] the possibility of a constitutionally valid conviction for the robbery . . . ." Id. at 369.

Both Ashe and Turner, however, involved separate trials tried successively over a period of time. Neither involved a mistrial or a new trial on remand from an appellate court. While affirming the second degree murder conviction in this case, the Court of Criminal Appeals placed particular emphasis on the fact that the charged offense, felony murder, was not "subsequent." We disagree

with that assessment. An issue essential to the success of the felony murder prosecution had been fully and finally resolved prior to the remand on the charge in Count I and the retrial on the charge in Count II.

As stated, there were originally three counts in the indictment: (I) the first degree premeditated murder of Robinson; (II) the first degree felony murder of Robinson, predicated upon her death being the result of an attempt to perpetrate the first degree murder of Burgins; and (III) the attempt to commit the first degree murder of Burgins. As to Counts I and II, first degree murder is defined, in pertinent part as to this Defendant, as follows: "(1) a premeditated and intentional killing of another; (2) a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder . . . ." Tenn. Code Ann. § 39-13-202(a)(1)-(2) (Supp. 2000).[11]

In the first trial, proof of premeditation to the satisfaction of the jury was essential for a conviction as to Count I. The first jury returned a verdict of second degree murder, defined as the knowing killing of another, but, implicitly, absent premeditation. See Tenn. Code Ann. § 39-13-210 (1997). Similarly, as to Count III in the first trial, the attempt to commit the first degree murder of Burgins, proof of premeditation to the satisfaction of the jury was essential to a conviction. The jury, however, reached a verdict of attempted second degree murder, a knowing, but unsuccessful, effort to kill another, and implicitly an attempt absent the element of premeditation.[12]

Obviously, the Defendant failed in his efforts to kill Burgins. When the jury found an attempt to commit second degree murder, their verdict necessarily established that the evidence was insufficient on the element of premeditation. That not only served as an acquittal on the primary charge, but a rejection of the State's theory that the Defendant had attempted to kill Burgins with premeditation.[13] Our examination of the entire record of the evidence and the trial court's instructions to the jury leads us to the inevitable conclusion that the jury could not "have grounded its verdict in the first trial upon an issue other than that which the Defendant seeks to foreclose." Ashe v. Swenson, 397 U.S. at 444.

---

[11] Criminal attempt, of course, is also defined by statute in Tennessee; the Sentencing Commission comments further provide that "[c]riminal attempt is an offense directed at the individual whose intent is to commit an offense, but whose actions, while strongly corroborative of criminal intent, fail to achieve the criminal objective intended." Tenn. Code Ann. § 39-12-101, sentencing commission comment (1997).

[12] In contrast, Count II in the first trial, as previously stated, ended in a hung jury. No culpable mental state is required for felony murder; however, there is a mens rea requirement as to the predicate offense as defined by statute, Tennessee Code Annotated section 39-13-202(b), and the further requirement that the killing must be "done in pursuance of the unlawful [predicate felony], and not collateral to it." State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting State v. Farmer, 296 S.W.2d 879, 883 (Tenn. 1956)). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Because the jury could not reach a verdict on the felony murder charge as to Count II, it is impossible to identify what element either in the primary charge or, for that matter, any lesser included offense, was left unresolved.

[13] Recently, of course, this Court upheld the validity of jury instructions that actually require an acquittal on the indicted charge before any consideration may be given to lesser-included offenses. Davis, 266 S.W.3d at 901.

The first trial produced a final, unappealable judgment as to the attempted first degree murder. "As a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). A judgment of acquittal, however, is final upon entry. Fong Foo v. U.S., 369 U.S. 141, 143 (1962) (quoting United States v. Ball, 163 U.S. 662, 671 (1896)). In Ball, our Supreme Court held as follows:

> As to the defendant who had been acquitted by the verdict duly returned and received, the court could take no other action than to order his discharge. The verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting him twice in jeopardy, and thereby violating the constitution. However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense.

163 U.S. at 671.

Further, in State v. Scarbrough, a new trial was ordered on the felony murder conviction but the conviction of the predicate offense, aggravated burglary, was affirmed on appeal. The two counts in the indictment arose out of the same criminal transaction and were a part of the same prosecution. For the purposes of resolving the question of whether the aggravated burglary could be used by the State in an offensive manner in a subsequent trial, this Court treated the conviction as final. While the State was prohibited from utilizing that conviction to establish an essential element in the felony murder trial which followed, this Court specifically recognized the finality of the conviction for the aggravated burglary and permitted it as evidence of guilt in the second trial:

> Allowing the prosecution to use a final conviction as evidence in the trial is consistent with Rule 803(22), as well as with the reality that the conviction is final and may have probative value. Because the conviction is simply evidence, however, and is not entitled to preclusive effect under collateral estoppel, the defendant may contest the conviction by introducing contrary evidence and argument.

Scarbrough, 181 S.W.3d at 660.[14]

Conversely, in State v. Huskey, 66 S.W.3d 905, 928 (Tenn. Crim. App. 2001), our Court of Criminal Appeals examined a claim of estoppel in the context of former jeopardy after a jury had announced that it had unanimously agreed that Huskey had a mental disease or defect but also stated that it could not agree as to his capacity to appreciate the wrongfulness of his conduct or conform with the requirements of law. Ultimately, the jury was unable to reach a verdict, and the trial court declared a mistrial. In the second trial, Huskey contended that because the jury in the first trial found

---

[14] Trial courts must nevertheless find that the probative value of the prior conviction is not substantially outweighed by the risk of unfair prejudice. Cf. Tenn. R. Evid. 803(22) & 403.

him to have a mental disease or defect, the state was bound by the doctrine of collateral estoppel.[15] The Court of Criminal Appeals disagreed, ruling that the statement by the jury did not arise out of a "prior" judgment, because there was no verdict. The court described jeopardy, which had attached when the jury was sworn, as a continuing concept after the declaration of a mistrial. Id. at 927.

---

[15] In Huskey, our Court of Criminal Appeals, citing as authority United States v. Bailin, 977 F.2d 270, 276 (7th Cir. 1992), made the following observation:

> The Seventh Circuit has applied the principles of collateral estoppel when the first jury acquitted the defendant of some counts but deadlocked on other counts. Noting that the original jeopardy is deemed to continue in the event of a hung jury, the court concluded that issue preclusion arising out of separate counts of the first trial is not collateral: "Issue preclusion 'within the confines of a single claim or cause of action' is known as 'direct estoppel.'" Id. at 276 (quoting 18 Charles A. Wright, et al., Federal Practice & Procedure § 4418, at 169 (1981)). The court held that direct estoppel applies in a criminal case to bar the government from relitigating issues in the retrial of the mistried counts that were "necessarily and finally decided in the defendant's favor by reason of the jury's partial acquittal on other counts."

Huskey, 66 S.W.3d at 927-28. The Eleventh Circuit also cited Bailin for the proposition that "a retrial cannot be 'collateral' if it is a 'continuation' of the first trial." United States v. Shenberg, 89 F.3d 1461, 1478 (11th Cir. 1996); see also United States v. Console, 13 F.3d 641, 664 n.25 (3d Cir. 1993) (noting the Seventh Circuit's use of the term "direct estoppel" in the context of reprosecution of a mistried count). The Eleventh Circuit observed, however, that the "analysis . . . remains the same, whether we refer to the application of estoppel principles as 'direct' or 'collateral,'" and proceeded to "refer to the estoppel principles collectively as collateral estoppel" to avoid confusion. Id.; see also Bailin, 977 F.2d at 280 n. 15 (noting that the "rules . . . developed in cases involving collateral estoppel . . . govern direct estoppel as well").

United States v. Frazier, 880 F.2d 878 (6th Cir. 1989), is the lead case in the Sixth Circuit on the issue of criminal collateral estoppel. In an appeal from the United States District Court for the Eastern District of Tennessee, the Sixth Circuit held that an acquittal on a count charging misapplication of funds as to a certain loan precluded, on collateral estoppel grounds, a retrial on a count charging false entries relating to the same loan. Id. at 885-86. Since 1989, some thirty cases using the term "collateral estoppel" have cited Frazier as authority.

We have chosen to use the term "collateral estoppel," as we did in Scarbrough, for the same reasons stated in Shenberg. Regardless of the precision of the terminology, the clear majority of the federal circuit courts use the term "collateral estoppel" as we have here. In fact, other than the Third and Eleventh Circuits, which acknowledge the Seventh Circuit's use of the term "direct estoppel," Bailin and cases confined to the Seventh Circuit are the only federal cases we have found that, in the context of a retrial of mistried counts, apply the term "direct estoppel" to the principles commonly known as "collateral estoppel."

The Seventh Circuit has also used the term "issue preclusion" to describe the principles espoused in Ashe. In Bailin, the government argued that collateral estoppel, as embodied in the Double Jeopardy Clause, could never apply when former jeopardy protections did not; the Seventh Circuit rejected the argument, holding as follows:

> A criminal defendant has no need for the benefits of issue preclusion if his entire prosecution is barred by double jeopardy; if double jeopardy bars the entire prosecution, then a court need not consider whether particular issues are precluded from relitigation. Precisely contrary to the government's assertion, collateral estoppel is applicable in criminal cases *only when double jeopardy is not*.

977 F.2d at 275 (footnote omitted).

Implicit in that holding, we think, is that either an acquittal or an unappealed conviction, had the jury been able to unanimously agree, would have been treated as a final judgment and any ensuing trial on separate counts would have been treated as subsequent for collateral estoppel purposes.

An acquittal is indeed final upon entry. The verdict in the first trial acquitting the Defendant on the charge of the attempted first degree murder of Burgins had, therefore, become final before the retrial on the felony murder charge. This assessment comports with our ruling in State v. Scarbrough and is consistent with the rationale employed by the Court of Criminal Appeals in State v. Huskey. In Shenberg, the Eleventh Circuit Court of Appeals described a two-step inquiry as to whether collateral estoppel applied in a retrial: "First, courts must examine the verdict and the record to see 'what facts,' if any, were necessarily determined in the acquittal at the first trial. . . . Second, the court must determine whether the previously determined facts constituted 'an essential element' of the mistried count." 89 F.3d at 1479 (citing U.S. v. Brown, 983 F.2d 201, 202 (11th Cir. 1993)). Here, both criteria have been met. The Defendant could not have been convicted of felony murder absent sufficient proof of one of the predicate offenses as enumerated by statute. The first jury rejected the element of premeditation, critical for the crime of attempted first degree murder. Attempted second degree murder did not qualify under the existing law. After a careful review of this record, it is apparent that there was no other basis for a prosecution for felony murder in the second trial. The promotion of finality in litigation, conservation of judicial resources, and the avoidance of inconsistent judgments are policy reasons warranting the application of collateral estoppel to these circumstances. Because an essential element of the offense had been previously resolved by a jury in a manner favorable to the Defendant, the doctrine of collateral estoppel should have precluded the State from proceeding with the prosecution for felony murder both under the United States Constitution[16] and independently under the Tennessee Constitution. Thus, the conviction for second degree murder, as a lesser-included offense of the felony murder charge, must be set aside.

**Conclusion**

Because in a previous trial the Defendant had been acquitted of attempted first degree murder, a predicate offense essential to the prosecution of felony murder in this case, collateral estoppel as a corollary of the constitutional protection against double jeopardy should have precluded the trial for felony murder. The conviction of second degree murder as a lesser-included offense of

---

[16] The United States Supreme Court recently granted a petition for writ of certiorari to the Fifth Circuit Court of Appeals to consider whether criminal collateral estoppel bars retrial where a defendant was acquitted by the jury on some counts, but the jury failed to reach a verdict on other counts in the indictment that share elements with the acquitted counts. See United States v. Yeager, 521 F.3d 367 (5th Cir. 2008), cert. granted, 129 S. Ct. 593 (2008). The Sixth Circuit has held that mistried counts do not preclude the application of collateral estoppel based upon issues necessarily decided as part of the acquitted counts. See Frazier, 880 F.2d at 883 ("No such inconsistency is necessarily present . . . when a jury acquits on some charges and fails to agree on others. Both the acquittal and the failure to agree could result from a number of factors, none of which makes the verdict inconsistent or the jury's actions irrational."). To the extent our analysis is based upon the United States Constitution, it is consistent with this approach, which is the one taken by the majority of federal circuits addressing the issue.

the charge of felony murder, must, therefore, be set aside.  The judgment and sentence for voluntary manslaughter on Count I is affirmed.  Costs of this appeal are assessed to the State of Tennessee.


_____
GARY R. WADE, JUSTICE