IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 18, 2017 Session

## STATE OF TENNESSEE v. MATTHEW GLEN HOWELL

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-857    Monte Watkins, Judge**

---

**No. M2016-01812-CCA-R3-CD**

---

The defendant, Matthew Glen Howell, who was originally charged with aggravated assault, appeals his 2016 Davidson County Criminal Court conviction of simple assault, which was imposed by the trial court after the jury found the defendant guilty of the inapplicable lesser included offense of reckless aggravated assault. The defendant argues that, because the jury acquitted him of the crime of intentional or knowing aggravated assault and instead found him guilty of reckless aggravated assault, the trial court erred by amending the conviction offense to one that required an intentional or knowing mens rea. The defendant also challenges several of the trial court's evidentiary rulings. Because the jury found the defendant guilty of a crime that did not exist under the facts of the case and because double jeopardy and collateral estoppel principles precluded the trial court from imposing a conviction that required an element of which the defendant had already been acquitted, the defendant's conviction of simple assault is vacated, and the case is dismissed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Vacated; Case Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. TIMOTHY L. EASTER, J., filed a separate dissenting opinion.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Matthew Glen Howell.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Derry Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In April 2015, the Davidson County Grand Jury charged the defendant with one count each of resisting arrest and aggravated assault by causing the victim, Liela Avila, to fear bodily injury by use or display of a deadly weapon. The trial court conducted a jury trial in February 2016.

The State's proof at trial showed that the victim moved to Nashville in early September of 2014 to pursue a career in music. Approximately one month later, she met the defendant at a karaoke bar and mentioned that she was searching for a new place to live. The defendant told the victim that he had a room to rent at his residence at 1236 Canyon Ridge Court, and the victim agreed to pay $350 per month in rent. The victim moved into the defendant's residence around October 12, 2014, and met the defendant's then-girlfriend, Alisha Brown, who also resided at the defendant's home.

The victim testified that she, the defendant, and Ms. Brown got along well at first. At some point in November, the defendant's dog escaped from the house and attacked a neighbor's cat. According to the victim, the defendant blamed the victim for the incident and told her that she owed "a couple thousand dollars" for the cat's veterinary bills. The victim received a citation from Animal Control. She went to court, explained that she "wasn't guilty," and the court cited the defendant instead "because it was his dog and [the victim] wasn't even home at the time" of the incident. The defendant then informed the victim that he and the cat's owner had agreed to settle the matter for approximately $1,600 and that the victim "was gonna have to pay for it."

Because the victim was preparing to fly to Los Angeles to spend Thanksgiving with her family and because she was concerned about starting a "heated argument" with the defendant when she was leaving all of her personal belongings in the defendant's house, the victim "just tried to play it cool" and told the defendant that she would "deal with" the situation when she returned to Nashville on December 8.

At some point after moving into the defendant's house but before leaving town for Thanksgiving, the victim purchased a 1996 Chevrolet Lumina from a friend of the defendant's, whose name the victim could not recall. The victim testified that she paid the friend $1,600 and that he "signed over the pink slip" for the vehicle while the two were standing in the kitchen of the defendant's residence. Through the victim's testimony, the State introduced into evidence a copy of the vehicle's certificate of title, which lists the victim as the owner of the vehicle. The victim denied obtaining the vehicle's title from the defendant or paying the defendant for the vehicle.

While the victim was in California, the defendant contacted her to inform her that her new vehicle, which was parked on the street in front of the defendant's house, was blocking his mailbox and that the mailman was going to have the car towed because of his inability to deliver the mail. The defendant asked her to mail him a set of her car keys so that he could move her vehicle and prevent its being towed. Because the victim had two sets of car keys, she mailed one set to the defendant.

On the evening of December 7, the victim received a text message from the defendant, which stated, "'You need to find a new place to live, because you can't live here anymore.'" The victim sent a text message back to the defendant, asking him what he was talking about, but the defendant never responded. When the victim returned to Nashville the following evening, she took a taxi to the defendant's residence, arriving between 9:00 and 9:30 p.m. The front door to the residence was unlocked, and the victim walked inside. She immediately asked the defendant about the location of her vehicle, having noticed that it was not parked in front of the house. The defendant responded, "'You aren't going to see that car again, unless you pay me the money for the vet bill.'" The victim "tried to reason with him" but found it difficult because the defendant "was very intoxicated." The victim eventually told the defendant that she would "walk to a place" so that she could ask her "parents to wire [her] some money." The victim testified that her intent was to pay "half" of the veterinarian's bill, explaining that, even though the dog's escape from the residence was not her fault, she "was willing to pay six-hundred bucks, to just get [her] things and leave and never look back, and just get away from that place."

Approximately 45 minutes later, the victim returned to the defendant's residence and again entered though the unlocked front door. The victim informed the defendant that she had the money but that she needed to know the location of her car. The defendant replied that the car had been parked in his garage all along. The victim then described what happened next:

> I started to gather some of my belongings and started to put it in the car. Again, he was very intoxicated. He was downstairs on the sofa. He wasn't really – he didn't really know what was going on. He was just kind of incoherent.
>
> I was just trying to just get my things and just go, as quickly as I could. And, when I had most of my stuff packed away, I was – I had told him, "I'm leaving, and I'm not giving you any money. And, if you don't let me leave, I'm gonna call the cops."

. . . .

After that I – at that – when I said that, I was upstairs, at the top of the stairs, still gathering some of my things from my room; the [d]efendant was at the bottom of the stairs.

I turned around back to my room, just to grab a coupla [sic] more things. And, as I left the room and went to the stairs, I saw the [d]efendant with a gun, coming – stumbling up the stairs towards me, pointing the gun at my head.

. . . .

He had the gun in his right hand. He had his hand on the banister; and he was stumbling drunk up the stairs, pointing the gun at me, and he was yelling at me.

. . . .

He said, "You're leaving my f[***]ing house right f[***]ing now."

And I said, "Please don't point a gun at me."

And he said, "[Y]ou are godd[***] certain. Get the f[***] out of my f[***]ing home now."

Through the victim's testimony, the State introduced into evidence and played for the jury an audio recording of the preceding four-sentence exchange that the victim made on the night in question using an application on her cellular telephone.

The victim testified that she was "in shock" and was "very afraid that the gun was going to go off and shoot" her. According to the victim, as the defendant began ascending the stairs toward her, she developed "tunnel vision," dropped her remaining personal belongings, and fled through the front door. The victim then ran to a neighbor's house, where she called 9-1-1 to report that her "roommate pointed a gun at" her and "wouldn't let [her] leave with [her] property."

Metropolitan Nashville Police Department ("Metro") Officers Joshua Vaughn and Wallis Massey were the first to respond to a call of a "domestic-related" situation that involved a handgun at 1236 Canyon Ridge Court in the early morning hours

- 4 -

of December 9.  Officer Massey initially spoke with the victim, who was standing outside of a residence a few houses away from the subject address, and the victim told Officer Massey that the defendant had threatened her with a handgun if she did not pay her rent.  Officer Vaughn and Officer Justin McCormick, who had just arrived on the scene, approached the defendant's residence, and the defendant appeared at the front door.  When the officers asked the defendant to explain what had transpired, the defendant repeatedly claimed that he had done "nothing wrong" and that he had "never placed hands on the victim."  When Officer McCormick asked the defendant if he was in possession of any weapons, the defendant responded that he had weapons inside the house but none on his person.  Officer McCormick asked the defendant if he could conduct a pat-down, and the defendant adamantly refused.  Believing that a pat-down was necessary to ensure his safety, Officer McCormick grabbed the defendant's left arm, prompting the defendant to turn and pull away from Officer McCormick.  Other officers then stepped in to assist Officer McCormick in placing handcuffs on the defendant.

When the defendant had been taken into custody and given his *Miranda* warnings, the defendant told Officer McCormick that "he had a handgun during the incident and that it was down to the side but he never pointed it at the victim."  The defendant also stated that "he wasn't stupid and wouldn't have one in the chamber."  Detective Daniel Polk, who spoke with the defendant on the scene after issuing *Miranda* warnings, recalled that the defendant had told him that he had the gun "in [his] hand" but that he "did not point it at" the victim during the dispute.  Officer Vaughn recovered the handgun at issue, which was a semiautomatic Glock and which was loaded with a magazine containing 45-caliber bullets.

After the defendant had been placed in a police car, Officer Massey and Metro Officer James Jensen accompanied the victim back inside the residence so that she could retrieve her remaining belongings.  When the victim entered her car inside the garage, the engine would not start.  The victim then asked the officers if they would assist her in pushing her vehicle into the street so that she could have the car towed.  The officers informed the victim that they were unable to assist her because they had no proof of ownership of the vehicle, so the victim placed her car into neutral and pushed the car onto the street.  The victim slept inside her vehicle that night, and the following morning, the victim had the vehicle towed.

On cross-examination, the victim clarified that she had paid the defendant a total of $700 in rent: $350 for October and another $350 on November 1.  The victim denied that the defendant had "kicked [her] out" of his house in November, but she admitted that she had never had a key to the residence.  Although the victim admitted that she had contacted her friend, Shawn, during the time period when she left the defendant's

house under the guise of collecting money for him, she denied that Shawn had ever entered the defendant's house on the night in question.

With this evidence, the State rested. Following a *Momon* colloquy and the trial court's denial of the defendant's motion for judgments of acquittal, the defendant elected to testify and to present proof.

Edward Allen Yeargan testified that he had power of attorney for his wife's parents and that he had sold their 1996 Chevrolet Lumina to the defendant on December 1, 2014. Mr. Yeargan testified to the difficulties the defendant had in locating the original title document and in actually getting the vehicle titled in the defendant's name. Through Mr. Yeargan's testimony, the defense marked for identification purposes photocopies of the purported bill of sale and duplicate car title. Mr. Yeargan explained that he gave the original documents to the defendant and that the originals were either "taken" or "lost."

Ms. Brown, a correctional officer at the Tennessee Prison for Women, resided with the defendant at 1236 Canyon Ridge Court in 2014. At the time they met the victim, the defendant was out of work and Ms. Brown was the primary wage-earner. Because their mortgage payment was $1,500 per month, they thought that the victim would be "a good candidate" for rental income.

Ms. Brown recalled that the victim never paid any rent, and Ms. Brown was "under the assumption" that when the victim left to go to California, she did not plan to return to Nashville. Ms. Brown believed that she and the defendant "were to package the rest of [the victim's] stuff up and mail it on out to her." Ms. Brown was surprised when the victim just "walk[ed] in through [the] front door" on the night of December 8. The victim's "eyes seemed bloodshot," and she did not appear to be "completely sober." The victim was accompanied by an unknown man, and the two proceeded upstairs to the victim's former bedroom. Ms. Brown recalled that the victim mentioned "grabbing one or two items," so Ms. Brown was under the impression that she would be leaving soon. The victim and her friend, however, stayed at the house, despite Ms. Brown's repeated requests over the course of nearly two hours that she leave the premises.

Eventually, Ms. Brown went to bed because she needed to wake up at 4:00 a.m. to get to work. At some point, she was awakened by the defendant, who told her that police officers were at the front door.

The defendant testified that he met the victim at a local karaoke bar and that he overheard her talking about living out of her car. The defendant offered to let the victim move into his second-floor bedroom, provided she was willing to sign a lease

agreement and give the defendant a security deposit. The victim agreed, moving in around mid-October, but she never complied with either requirement. According to the defendant, at some point after the victim moved in, she "got high and careless" and "left the door open," permitting the defendant's dog to escape and attack a neighbor's cat. Because the victim refused to cover the veterinary bills and had never signed a lease or paid any rent, the defendant told her that she must vacate the premises. The defendant recalled that the victim had been gone for approximately one month when she, accompanied by an unknown male, suddenly entered his house on the night of December 8.

The defendant testified that both the victim and her friend "were so high" that they were "incoherent." Over the course of approximately two hours, the defendant repeatedly demanded that they leave his residence, but the couple refused to go. Eventually, the defendant forced the male companion out of the house when the man "put hands on" the defendant. The defendant insisted that he never pointed a handgun at or threatened the victim, but he acknowledged that he raised his voice. The defendant did, however, say that the victim had threatened to harm herself and accuse him of inflicting the harm. Although he did not see it happen, the defendant believed that the victim or her friend stole his original certificate of title to his Chevrolet Lumina during the time they were inside the residence. When the defendant returned to his residence the next day following his release from jail, he was unable to locate the certificate of title.

The defendant finally was successful in forcing the victim to leave, and he locked the front door behind her. Less than half an hour later, officers arrived at his house. When the defendant answered the door, he informed the officers that the victim had broken into his house and that he wished to take out a restraining order against her. The defendant acknowledged that he refused to allow the officers to enter his residence, but he denied resisting arrest, testifying that the officers had used excessive force in their efforts to handcuff him and place him under arrest. The defendant also denied telling Detective Polk that he had been holding a handgun during his encounter with the victim.

At the close of the proof and following closing arguments, the trial court charged the jury, without objection from either party, that reckless aggravated assault was a lesser-included offense of aggravated assault. The instruction provided to the jury with respect to the elements of the crime of reckless aggravated assault read as follows:

> For you to find the [d]efendant guilty of this offense, the State must have proven – proven beyond a reasonable doubt the existence of the following essential elements:

> (1)    That the [d]efendant recklessly caused another to reasonably fear imminent bodily injury; and
>
> (2)    That the act involved the use of or display of a deadly weapon.

The jury was also instructed that reckless endangerment and simple assault were lesser included offenses of aggravated assault.

The jury then acquitted the defendant of both aggravated assault and resisting arrest but found him guilty of reckless aggravated assault. In its role as thirteenth juror, the trial court affirmed the jury's verdict. Prior to sentencing, the defendant moved to dismiss the reckless aggravated assault conviction on the ground that the crime did not exist based upon the facts of the case. The trial court agreed that reckless aggravated assault and reckless endangerment had been improperly charged because the victim suffered no bodily injury, but the trial court amended the jury's verdict to that of simple assault. Following a sentencing hearing, the trial court imposed a sentence of 11 months and 29 days of supervised probation, following the service of 30 days in jail.

Following the trial court's denial of the defendant's motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that because the jury acquitted him of the crime of intentional or knowing aggravated assault and instead found him guilty of reckless aggravated assault, the trial court erred by amending the conviction offense to one that required an intentional or knowing mens rea. In addition, the defendant asserts that the trial court abused its discretion by excluding evidence of his civil lawsuit against Metro officers involved in his arrest and by denying his request to impeach the victim pursuant to Tennessee Rules of Evidence 608 and 616. We will address each issue in turn.

*I. Reckless Aggravated Assault Conviction*

The defendant first contends that the trial court erred by amending his conviction offense of reckless aggravated assault to that of simple assault, arguing that principles of double jeopardy and collateral estoppel preclude his conviction of an offense which requires an intentional or knowing mens rea. The State counters that the proper remedy is to remand the case for a new trial on "all proper lesser included offenses."

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V;

Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the double jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument."). The United States Supreme Court has observed of the double jeopardy clause:

> Our cases have recognized that the Clause embodies two vitally important interests. The first is the 'deeply ingrained' principle that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' The second interest is the preservation of 'the finality of judgments.'

*Yeager v. United States*, 557 U.S. 110, 129 S. Ct. 2360, 2365-66 (2009) (citations omitted). To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness. *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Because the precise language of the statutes regarding assault is so germane to our discussion of this issue and the facts of this case, we include them, in pertinent part, here:

> **Assault.** – (a) A person commits assault who:
> (1) Intentionally, knowingly or recklessly causes bodily injury to another; [or]
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; . . . .

T.C.A. § 39-13-101(a)(1)-(2). Under this formulation, the offense of reckless assault requires bodily injury.

> **Aggravated Assault.** – (a)(1) A person commits aggravated assault who:
> (A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:
> > (i) Results in serious bodily injury to another;
> > (ii) Results in the death of another; [or]
> > (iii) Involved the use or display of a deadly weapon; . . . .
> (B) Recklessly commits an assault as defined in § 39-13-101(a)(1), and the assault:
> > (i) Results in serious bodily injury to another;
> > (ii) Results in the death of another; or
> > (iii) Involved the use or display of a deadly weapon.

T.C.A. § 39-13-102(a)(1). By incorporating the offense of reckless assault into reckless aggravated assault, the statute carries forward the requirement of bodily injury.

> **Reckless Endangerment.** – (a) A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury.
> > . . . .
> (b)(2) Reckless endangerment committed with a deadly weapon is a Class E felony; . . . .

T.C.A. § 39-13-103(a), (b)(2).

Here, the defendant was acquitted of the offense of aggravated assault, the pertinent elements of which were intentionally or knowingly causing the victim to reasonably fear imminent bodily injury through the display of a deadly weapon. *See* T.C.A. § 39-13-101(a)(1)(A)(iii). The jury convicted the defendant of the offense of reckless aggravated assault, which, as charged, meant that the defendant recklessly caused the victim to reasonably fear imminent bodily injury through the display of a deadly weapon. *See* T.C.A. § 39-13-101(a)(1)(B)(iii). The problem with this conviction, as acknowledged by the trial court, is that reckless aggravated assault "requires bodily injury." *State v. Goodwin*, 143 S.W.3d 771, 776 (Tenn. 2004). Similarly, felony reckless endangerment "is not a lesser-included offense of aggravated assault committed by intentionally or knowingly causing another to reasonably fear imminent bodily injury by

use or display of a deadly weapon." *State v. Moore*, 77 S.W.3d 132, 136 (Tenn. 2002). Thus, the trial court chose to amend the defendant's conviction to that of simple assault, noting that simple assault only required that the defendant "place the [victim] in fear."

The trial court's decision to amend the defendant's conviction to simple assault, however, was in error. Although the jury was charged on the lesser included offense of reckless aggravated assault that did not exist under the facts presented, the jury obviously believed that the evidence was sufficient to convict the defendant of this non-existent offense. The *only* distinction between aggravated assault and reckless aggravated assault as set forth in the jury instructions was the mens rea: intentional or knowing versus reckless. Therefore, the jury found that the defendant did not act with knowledge or intent, and the first category of double jeopardy protection, which precludes a second prosecution for the same offense after acquittal, attached to the finding of that mens rea. *See Watkins*, 362 S.W.3d at 541. Accordingly, when the trial court amended the defendant's conviction to simple assault, it did so in violation of the defendant's protection against double jeopardy because simple assault is an offense that requires an intentional or knowing mental state and specifically excludes the mens rea of recklessness. *See* T.C.A. § 39-13-101(a)(2).

The State relies on *State v. Goodwin* in support of its position that the case should be remanded to the trial court for a new trial "on all proper lesser included offenses." Goodwin was charged with aggravated assault by placing his victims in fear by use or display of a deadly weapon, and the jury found him guilty of the lesser-included offenses of reckless aggravated assault. *Goodwin*, 143 S.W.3d at 776. After determining that the evidence was insufficient to support the convictions of reckless aggravated assault because there was no proof of bodily injury, the high court remanded the case for a new trial on the lesser-included offense of simple assault, which "the jury never reached." *Id.* at 776-77.

In *Goodwin*, however, the issue of double jeopardy was never raised. More importantly, *Goodwin* was decided before *State v. Thompson*, 285 S.W.3d 840 (Tenn. 2009). Thompson was charged, in a three-count indictment, with the premeditated first degree murder and felony murder of one victim (Counts I and II) and the attempted first degree murder of a second victim (Count III). *Id.* at 841. The jury convicted Thompson of the lesser-included offenses of second degree murder in Count I and attempted second degree murder in Count III, and the trial court declared a mistrial as to Count II. *Id.* Because of jury instruction errors, this court reversed the convictions and remanded for a new trial. *Id.* The State dismissed Count III prior to the second trial and only prosecuted Thompson on the second degree murder and felony murder of the first victim. *Id.* At the conclusion of the second trial, the jury convicted him of the lesser-included offenses of voluntary manslaughter on Count I and second degree murder on Count II. *Id.* On

appeal to this court, Thompson argued that "because the jury had in effect returned a verdict of acquittal on the attempted first degree murder of the second victim, and because the alleged attempted first degree murder was the only possible predicate offense to support the felony murder charge in the retrial," principles of double jeopardy and collateral estoppel precluded the State from prosecuting him for felony murder. *Id.* This court affirmed the convictions, and the supreme court granted permission to appeal. *Id.*

The supreme court discussed the law of collateral estoppel, as applied through double jeopardy law, stating that the United States Supreme Court, in *Ashe v. Swenson*, 397 U.S. 436, 443 (1970), "defined collateral estoppel to mean that when an issue of fact has been determined by a valid and final judgment, it may not be litigated by the same parties in any future litigation" and noted that "its application [was] 'embodied in the Fifth Amendment guarantee against double jeopardy.'" *Thompson*, 285 S.W.3d at 847-48 (quoting *Ashe*, 397 U.S. at 445). To determine whether collateral estoppel is applicable, courts must "consider the indictment and pleadings, the evidence, the instructions to the jury, and any other relevant matter 'in a practical frame and viewed with an eye to all the circumstances of the proceedings'" to "determine 'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Thompson*, 285 S.W.3d at 848 (quoting *Ashe*, 397 U.S. at 444). The party relying upon collateral estoppel has the burden to prove "that a specific point at issue has been previously and finally decided." *Thompson*, 285 S.W.3d at 848 (citations omitted).

In its analysis, the high court stated as follows:

[T]here were originally three counts in the indictment: (I) the first degree premeditated murder of Robinson; (II) the first degree felony murder of Robinson, predicated upon her death being the result of an attempt to perpetrate the first degree murder of Burgins; and (III) the attempt to commit the first degree murder of Burgins. As to Counts I and II, first degree murder is defined, in pertinent part as to this Defendant, as follows: "(1) a premeditated and intentional killing of another; (2) a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder . . . ." [T.C.A.] § 39-13-202(a)(1)-(2) (Supp. 2000).

In the first trial, proof of premeditation to the satisfaction of the jury was essential for a conviction as to Count I. The first jury returned a verdict of second degree murder, defined as the knowing killing of another, but,

- 12 -

implicitly, absent premeditation. *See* [T.C.A.] § 39-13-210 (1997). Similarly, as to Count III in the first trial, the attempt to commit the first degree murder of Burgins, proof of premeditation to the satisfaction of the jury was essential to a conviction. The jury, however, reached a verdict of attempted second degree murder, a knowing, but unsuccessful, effort to kill another, and implicitly an attempt absent the element of premeditation.

Obviously, the Defendant failed in his efforts to kill Burgins. When the jury found an attempt to commit second degree murder, their verdict necessarily established that the evidence was insufficient on the element of premeditation. That not only served as an acquittal of the primary charge, but a rejection of the State's theory that the Defendant had attempted to kill Burgins with premeditation. Our examination of the entire record of the evidence and the trial court's instructions to the jury leads us to the inevitable conclusion that the jury could not "have grounded its verdict in the first trial upon an issue other than that which the Defendant seeks to foreclose." *Ashe v. Swenson*, 397 U.S. at 444.

The first trial produced a final, unappealable judgment as to the attempted first degree murder[, and a] judgment of acquittal . . . is final upon entry. *Fong Foo v. U.S.*, 369 U.S. 141, 143 . . . (1962) (quoting *United States v. Ball*, 163 U.S. 662, 671 . . . (1896)). . . .

. . . .

Because an essential element of the offense had been previously resolved by a jury in a manner favorable to the Defendant, the doctrine of collateral estoppel should have precluded the State from proceeding with the prosecution for felony murder both under the United States Constitution and independently under the Tennessee Constitution. Thus, the conviction for second degree murder, as a lesser-included offense of the felony murder charge, must be set aside.

*Thompson*, 285 S.W.3d at 851-55 (internal footnotes omitted).

- 13 -

In determining whether the present case falls within the ambit of the collateral estoppel rule, we are aware that, in *Ashe*, the Supreme Court predicated the use of collateral estoppel upon a factual issue's being "determined by a valid and final judgment." *Ashe*, 397 U.S. at 445. In the present case, the issue of fact – whether the defendant acted intentionally or knowingly – has been addressed as part of one, still-ongoing case. Within the bounds of a given case, the law in some circumstances does not countenance going behind a jury's verdict to prove the intent of the jury. *See, e.g., State v. Davis*, 466 S.W.3d 49, 72-77 (Tenn. 2015) (discussing inconsistent verdicts and emphasizing that "'[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)); *State v. Paul Allen St. Clair*, No. M2012-00578-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nashville, Apr. 16, 2013) (Smith, J., concurring in part and dissenting in part) ("Our state supreme court has said that jury nullification is neither a personal right of the accused nor of the jury itself, although juries sometimes do nullify applicable law." (citing *Wright v. State*, 394 S.W.2d 883, 885 (Tenn. 1965)). Thus, the singular, continuing case view might lead us to ignore the verdict of guilty of reckless aggravated assault. On the other hand, however, the jury submitted its not-guilty verdict on aggravated assault and its guilty verdict on reckless aggravated assault. The trial court then rejected the latter verdict and did so properly. We discern that *Thompson* supports the view that the critical fact issue was specifically and finally determined by the jury: the defendant did not act intentionally or knowingly. Thus, the trial court is estopped from *subsequently* entering a conviction of assault, an offense predicated upon an intentional or knowing action.

The dissent would have this court follow the path urged by the State: remand the case for a new trial on the lesser-included offense of simple assault.[1] In support of this position, the dissent cites a number of post-*Thompson* cases for the proposition that a new trial on lesser-included offenses would be the appropriate remedy where the greater offense did not stand. *See State v. Whited*, 506 S.W.3d 416, 447-48 (Tenn. 2016) (finding that although evidence was insufficient to support convictions of especially aggravated sexual exploitation of a minor, double jeopardy principles did not preclude State from retrying Whited on the lesser-included offense of attempt); *State v. Larkin*, 443 S.W.3d 751, 818 (Tenn. 2013) (reversing and dismissing Larkin's conviction of first degree premeditated murder due to insufficient evidence but holding that Larkin could be retried for second degree murder and any other appropriate lesser-included

---

[1] The State actually urged this court to remand the case for a new trial on "all proper lesser included offenses." As previously stated, however, the lesser-included offense of reckless endangerment was improperly charged due to the lack of bodily injury, leaving nothing but simple assault as a potential lesser-included offense.

offenses); *State v. Climer*, 400 S.W.3d 537, 571 (Tenn. 2013) (finding that although double jeopardy principles precluded a retrial of Climer on first degree premeditated murder, State was not precluded from retrial on second degree murder and abuse of a corpse); *State v. Cross*, 362 S.W.3d 512, 522-23 (Tenn. 2012) (vacating Cross's conviction of felony reckless endangerment because it had been improperly charged as a lesser-included offense of aggravated assault where the victim had been placed in fear and remanding for a new trial "on any lesser-included offense that ha[d] not already been rejected by the jury"). These cases, however, are distinguishable from the instant case. In *Whited, Larkin*, and *Climer*, the high court permitted a retrial on lesser-included offenses that did not contain an element of which the respective defendants had been acquitted, as in the case currently under review. Thus, double jeopardy would have no applicablity in such scenarios. With respect to the high court's decision in *Cross*, that defendant was convicted of felony reckless endangerment as an erroneously-charged lesser-included offense of aggravated assault, and the supreme court remanded the case for a retrial on any lesser-included offenses that had "not already been rejected by the jury." *Cross*, 362 S.W.3d at 523. We do not know, however, what additional lesser-included offenses had been considered and rejected by the jury, and, more importantly, the question of whether a retrial on the offense of simple assault would have been precluded by double jeopardy principles was never addressed.

In the instant case, the greater offense, aggravated assault, and the conviction offense, reckless aggravated assault, have only three elements: the defendant's required mental state, the victim's reasonable fear of imminent bodily injury, and the defendant's display of a deadly weapon. The two crimes are identical in nature with the single exception of the required mental state. Presuming as we must that the jury followed the instructions of the trial court, *see State v. Cribbs*, 967 S.W.2d 773, 784 (Tenn. 1998), and knowing, as previously discussed, that we cannot countenance jury nullification, the only conclusion to be drawn under the *specific facts of this case* is that the jury verdict necessarily includes a finding that the defendant did not act intentionally or knowingly. Thus, the jury could not, as the dissent suggests, have grounded its verdict in an issue other than that which the defendant seeks to estop. Moreover, we disagree with the dissent's conclusion that the jury's acquittal of aggravated assault did not equate to a "separate and distinct finding related to [the d]efendant's *mens rea*." To the contrary, the acquittal did exatly that: it signaled its clear intent to acquit the defendant of an intentional and knowing offense.

We therefore hold that a new trial on the offense of simple assault is barred by double jeopardy and collateral estopped principles. Because there are no other available lesser-included offenses, we vacate the trial court's judgment convicting the defendant of assault, and the case is dismissed.

Having concluded that the defendant's conviction must be vacated, we nevertheless will address the defendant's remaining issues in the interests of judicial economy and potential further appellate review.

## *II. Evidence of Federal Lawsuit*

The defendant next contends that the trial court abused its discretion by refusing to permit him to cross-examine Metro police officers regarding their bias. Specifically, the defendant argues that he should have been permitted to question the officers about the pending civil rights lawsuit he had filed against them in federal court, in which he claimed that they had illegally arrested him by entering his home without a warrant and without exigent circumstances, that they had illegally arrested Ms. Brown, and that he was entitled to damages for, *inter alia*, injuries caused to his shoulder during the arrest.

"The right to explore or examine witnesses for bias is a fundamental right," and "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article 1, Section 9, of the Tennessee Constitution." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001) (citations omitted). A Confrontation Clause violation is indicated when a defendant shows "'that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.'" *State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a party is biased in favor of or prejudiced against a party or another witness."

In the instant case, the defendant sought to question the Metro officers who responded to the scene on December 9 about the lawsuit he had filed against them in federal court, arguing that such evidence was "clearly relevant to the officers' bias under Rule 616." The trial court refused the request, stating as follows:

> But I don't see the connection between that federal lawsuit
> and these officers' bias with regard to this particular case. I
> mean this case occurred before. I just don't see that. So with
> regard to that federal lawsuit, I don't think any of it should
> come in, in this case. It's not relevant to this case.

Here, the trial court has committed a clear abuse of discretion. The trial court was focused inaptly upon the officers' actions that preceded the filing of the federal lawsuit in determining that the *actions* could not have been influenced by the filing of the federal lawsuit. The court should have focused upon the officers' *testimony* and the impact of bias on the witnesses' credibility. "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). That the Metro officers involved in the underlying case had been sued in federal court for unlawfully arresting the defendant on December 9, 2014, was certainly relevant to show their potential bias against the defendant. Indeed, at the pretrial hearing on this matter, an attorney with the Metro Legal Department appeared to argue a motion on separate but related grounds. As part of his argument, the Metro attorney noted that if the defendant were to be found guilty of resisting arrest at his criminal trial, such a finding would "eliminate [the] federal claim" of excessive force. Thus, the knowledge that a guilty verdict in the defendant's criminal trial could result in the dismissal of the federal action filed against them is, quite simply, a textbook example of bias, and the trial court abused its discretion in preventing the defendant from not only cross-examining the Metro officers about the lawsuit but from disallowing any extrinsic proof of the lawsuit, as permitted by Rule 616.

Our inquiry does not end there, however. Because the defendant's constitutional right to confrontation was violated, *see Black*, 815 S.W.2d at 177, the burden rested upon the State "'to prove that the constitutional right violation [was] harmless beyond a reasonable doubt,'" *Sayles*, 49 S.W.3d at 280 (quoting *Momon v. State*, 18 S.W.3d 152, 167 (Tenn. 2000)). In making this determination,

> "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Sayles*, 49 S.W.3d at 280 (quoting *Van Arsdall*, 475 U.S. at 684).

- 17 -

Because the jury acquitted the defendant of resisting arrest, we apply these factors only to the testimony of the officers as such testimony related to the defendant's conviction of reckless aggravated assault, such as it was. Both Officer McCormick and Detective Polk testified that the defendant told them, following the issuance of *Miranda* warnings, that he had been holding a handgun during his encounter with the victim but that he had never pointed the gun at the victim. Because the victim testified that the defendant had pointed a gun at her and because the defendant denied even having a gun during his encounter with the victim, the testimony of Officer McCormick and Detective Polk was particularly significant because it corroborated the victim's testimony and contradicted that of the defendant. Without question, the testimonies of Officer McCormick and Detective Polk were important to the State's case and were not cumulative. The trial court did not permit any cross-examination on the issue of the federal lawsuit, and the prosecution's case – without the corroborating testimony of the police officers – was frankly not particularly strong. This is a classic he-said-she-said case, and, given the jury's acquittal on the resisting arrest charge and conviction of the lesser-included offense of reckless aggravated assault, the jury may have found the defendant to be slightly more credible than the victim. Had the jury been apprised of the pending federal civil rights lawsuit against the officers involved in the defendant's arrest, such information could certainly have caused the jurors to question the officers' credibility. Thus, we cannot say that the trial court's error in preventing cross-examination and accompanying extrinsic proof of the lawsuit was harmless beyond a reasonable doubt, and this alone constituted reversible error.

### III. Impeachment of the Victim

Finally, the defendant argues that the trial court abused its discretion by denying his request to question the victim regarding a dismissed shoplifting charge in order to attack her character for truthfulness pursuant to Tennessee Rule of Evidence 608(b) and by denying his request pursuant to Rule 616 to question the victim about alleged favorable treatment she had received from the prosecution.

Prior to the commencement of the trial, the court conducted a hearing regarding the victim's criminal charges. The victim testified that she had been issued three citations on three separate dates in mid-to-late December of 2014: one for possession of less than a gram of marijuana, one for shoplifting in the amount of $500 or less, and one for possession of drug paraphernalia. With respect to the shoplifting charge, the victim explained that, after she had been forced out of the defendant's residence, she was living out of her car and that she had made "the poor decision" to shoplift some needed clothing. The victim admitted that all of the charges had been dismissed earlier that same day but denied any knowledge that the dismissal was occasioned by her testimony in the instant case against the defendant. At the conclusion

of her testimony, the prosecutor effectively conceded that "there is a basis under the fair reading of the law" to permit impeachment of the victim regarding the shoplifting charge. The defense argued that the dismissal of the three charges earlier that day, particularly the theft charge to which the victim admitted her guilt, evinced the appearance of a "quid pro quo," which should be presented to the jury. The trial court then ruled as follows:

> I mean [the victim] testified that there was nothing on the part of the district attorney's office that she's aware of that brought about the dismissal and it was no way related to this particular case. And, in any event, these are incidents that occurred after this, the charges here or the incidents alleged here, and they're really not relevant to what happened on December the 8th and 9th of 2014. I just don't see how they can be a part of it. They're not relevant. So they're not going to be allowed to come in.

> Tennessee Rule of Evidence 608 provides, in pertinent part, as follows:

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, . . . .; and

> (3) . . . .

> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the witness's privilege against self-incrimination when examined with respect to matters which relate only to character for truthfulness.

Tenn. R. Evid. 608(b). This court has previously stated that a "prior instance of conduct amounting to a theft would be admissible on the question of an individual's credibility under Tennessee Rule of Evidence 608(b) even if no conviction resulted from the conduct." *State v. Mario C. Gray*, No. M2006-00398-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, Dec. 17, 2007).

Here, again, the trial court abused its discretion by relating the impeachment basis – theft – to the time of the offense rather than to the time of giving testimony. The prosecution's entire case hinged on the victim's credibility. That she had been cited for theft – a crime that strikes at the heart of truthfulness and credibility – was certainly relevant and probative, and no issues existed about the timeliness of the conduct. Under Rule 608, the defendant should have been permitted to cross-examine the victim about the theft. Additionally, the defendant should not only have been permitted to question the victim about the very recent dismissal of her theft and drug charges to show the victim's bias under Rule 616, he should have been permitted to introduce extrinsic evidence of the dismissal of those charges, as permitted under the rule. *See* Tenn. R. Evid. 616. This violation of the defendant's constitutional right to confrontation was not harmless beyond a reasonable doubt, given the paramount importance of the victim's testimony to the State's otherwise anemic case. Accordingly, this, too, constituted reversible error.

*Conclusion*

Based upon the foregoing analysis, the judgment of the trial court is vacated, and the case is dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE