IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2022

**STATE OF TENNESSEE v. BRANDON WAYNE WATSON**

**Appeal from the Circuit Court for Tipton County**
**No. 9971     Joseph H. Walker, III, Judge**

---

**No. W2021-00371-CCA-R3-CD**

---

The defendant, Brandon Wayne Watson, appeals his Tipton County Circuit Court jury convictions of rape of a child and aggravated sexual battery, arguing that the evidence was insufficient to support his convictions. On cross-appeal, the State argues that the trial court erred by merging the defendant's conviction for aggravated sexual battery into his conviction for rape of a child. Because the evidence sufficiently supports the verdicts, we affirm the defendant's convictions. Because the defendant's dual convictions do not violate the principles of double jeopardy, we reverse the trial court's merger of the offenses and remand the case for a new sentencing hearing.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

David S. Stockton, Assistant District Public Defender, for the appellant, Brandon Wayne Watson.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Stephanie Draughon and James Walter Freeland, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Tipton County Grand Jury charged the defendant with one count of rape of a child and one count of aggravated sexual battery for offenses against his girlfriend's seven-year-old granddaughter.

At the August 2020 trial, Shalotta Sharp, a forensic nurse with the Mississippi Coalition Against Sexual Assault, testified as an expert sexual assault nurse examiner in the field of child sexual assault. Ms. Sharp explained that prior to puberty, a female child's genitalia are minimally flexible and that digital penetration can leave "[d]eviations . . . like notches or clefts" to the hymen that would be noticeable during an exam. She noted that the tissue, however, can heal very quickly leaving no "residual findings" or scar tissue, noting that even when penetration causes "trauma to that area then that could absolutely heal within days." She said that, in the case of oral abuse of a child, "there would more than likely not be physical findings" even if the child was examined immediately after the incident but that it is possible to collect saliva DNA "any where from 24 to 72 hours" after the abuse "based on the age of the child, type of contact, [and] hygiene that has taken place." Ms. Sharp said that "penetration or even contact with" a girl's genitalia "has to be purposeful" because the natural "layers of protection" and "the way the human body is made" prevent accidental contact.

Ms. Sharp testified that the medical records of the victim's treatment at Le Bonheur Children's Hospital on February 19, 2019, indicated that the victim's genitourinary "findings were normal," which findings did not surprise Ms. Sharp despite the victim's having reported that she was sexually assaulted. Ms. Sharp said that "it's very common for children to delay disclosures" of sexual abuse and that "it is rare for children to disclose abuse acutely . . . . meaning immediately after or in close proximity to an abuse event."

During cross-examination, Ms. Sharp acknowledged that she had not met with or examined the victim in this case and that her testimony referred to child sexual abuse generally and not to the victim specifically. She said that there could be myriad reasons why a child victim would not disclose sexual abuse but acknowledged that she did not know why the victim in this case did not immediately disclose the abuse.

On redirect examination, Ms. Sharp testified that it was common for a child to provide more details about the abuse sometime after an initial disclosure.

On re-cross examination, Ms. Sharp clarified that child victims may "disclose and give more details," "disclose and then don't give details," or "disclose and then recant where they say it never happened." She explained that because any of these scenarios can occur, "it's important to know so many factors about the child's environment, where they are developmentally, [and] what their age is."

The victim's mother testified that the victim, whose date of birth was March 31, 2011, was nine years old at the time of trial. In October 2018, the victim was seven years old and in the second grade. Although no longer together as a couple, the victim's

mother and father both lived in Bartlett, "about a mile" apart and co-parented the victim. The victim's mother said that she "g[o]t along great" with the victim's father and his family, noting that the victim's paternal grandmother, whom the victim called "Nana," "is very involved with [the victim] still." She said that the victim stayed over night with her grandmother on several occasions and "enjoy[ed] spending time with her." The victim's grandmother lived in Munford, approximately 35 minutes from the victim's mother. When the victim spent the night at her grandmother's house, she would usually sleep "on the couch in the living room." The victim's mother estimated that between October 1 and December 15, 2018, the victim spent the night with her grandmother once or twice. At that time, the victim's grandmother had been dating the defendant for two years or more, and the defendant lived with the victim's grandmother until they broke up on December 15 or 16, 2018.

The victim's mother said that in February 2019, a counselor at the victim's school had talked "about appropriate and inappropriate touching" and that the victim "had told one of her friends . . . that she believe[d] she was touched inappropriately. That student told the counselor." That same day, the victim came home from school and told her mother that she needed to tell her something. The victim's mother said that it "seemed like something that [the victim] thought was very important to tell me right then and there." When the victim said that she had been abused, her mother "almost cried" and told the victim "it was going to be okay and we'll handle it." The victim's mother called the police, who advised her to take the victim to the hospital, which she did later that afternoon. She said that she believed the abuse occurred the night of November 27 or the early morning of November 28, 2018.

The victim's mother said that she had noticed changes in the victim since learning of the abuse. As an example, she said that the victim had expressed that "she doesn't want a boyfriend ever" and "wants to be with a female, mainly because of the traumatic experience she's had with a male." The victim's mother said that the victim was also "very argumentative lately, very edgy. Just more held in than she used to be. You can tell that she has tucked herself away a lot more than she was when she was younger."

During cross-examination, the victim's mother explained that the victim's medical records indicated that the abuse occurred "'around Christmastime'" because that was what the victim had said at that time. The victim's mother said that she looked through photographs that the victim's grandmother had taken and posted to Facebook that showed when the victim was at her grandmother's house, and she "realized it was more towards Thanksgiving than Christmas." She said that she knew the incident had not occurred after December 15 because that was when the defendant moved out of the house. She acknowledged that the medical records indicated that the victim reported that the abuse occurred over Christmas break but said that the victim "was obviously confused about her

dates, just being a [seven]-year-old child." She said that the victim's grandmother and the defendant moved into the house where the abuse occurred in July or August of 2018 and that the defendant moved out on December 15 of that year. She reiterated that the victim stayed overnight with her grandmother only a couple of times during that period, and from those dates, she surmised that the abuse likely occurred when the victim stayed the night on November 27, 2018.

On redirect examination, the victim's mother identified a photograph of the victim dressed in Christmas attire that she took on December 12, 2018.

Syndi Turner testified as an expert in the field of forensic interviewing of children. She said that during a forensic interview, she permits a child to move around and "sit however they need to." She said that it was very common for children to be uncomfortable during the process and that it was her practice to begin by asking the child why they came to talk to her and then asking follow up questions. She said that she was "trained not to lead or suggest" a response and that "[w]hatever the child wants to talk about is what we talk about." Ms. Turner interviewed the victim over the course of two sessions on March 11 and 18, 2019. Ms. Turner said that she conducted the interview at the Carl Perkins Center in a small room that had a couch, chair, small table, and red rug. Only Ms. Turner and the victim were in the interview room, but Teresa Cook and Erica Cleaves from the Department of Children's Services ("DCS") and Detective Bert Zickefoose with the Munford Police Department were "across the hall in the observation room" where they could hear and see the interview in real time. Ms. Turner said that the victim knew that the interview was being recorded. She described the victim as "acting in an age-appropriate behavior" during the interview and that she appeared to understand the importance of telling the truth. During the first interview session, the victim "was more reserved and said that she didn't want to talk about certain things." During the second session, "she came in and she just sat on the couch and laid over and talked. Didn't say she didn't want to talk about anything that time." Ms. Turner said that at the end of each session, the victim gave her a hug before leaving.

Ms. Turner said that the victim described "one incident" of sexual abuse that involved "digital penetration and also oral sex." She said that the victim was able to describe the abuse, including how many times different parts of her body were touched and the number of times that she was penetrated. The victim was also able to describe the approximate time of day and the location where the abuse had occurred and what she was wearing at the time.

The video recordings of both sessions of the victim's forensic interview were exhibited to Ms. Turner's testimony, and the jury viewed the videos. In the interview, the victim told Ms. Turner that her grandmother's boyfriend, "Brandon," did something

"inappropriate" to her while she was at her grandmother's house over a weekend. She said that she stayed overnight at her grandmother's house on the weekends "sometimes" and would go to church with her grandmother the next day. The victim said that at the time of the offenses, three of her grandmother's sons lived there; one son was in high school, and the other two were eight and nine years old. The victim said that on one occasion while spending the night at her grandmother's house, she wore a purple Tinkerbell nightgown and underwear and slept on the couch in the living room. She said that she fell off of the couch but stayed on the floor under a blanket, pretending to be asleep when the defendant came into the living room and did something to her "two times[,] and then I went back on the couch and then he did it once." The victim said that she "knew" that the defendant would "do something" to her. She said that he "sounds all fine and stuff," but "at night," "he can do stuff" that "nobody knows." She said that the abuse was "just a one-time thing."

During the interview, the victim maintained that the abuse occurred over a weekend. She said that everyone else in the house was sleeping in their rooms at the time and that before the defendant came into the living room, he had been sleeping in the room that he shared with the victim's grandmother. She said that the defendant "touched a part of my body" with his "finger and mouth." She pointed to her genital area and said that he had touched her "private" with his finger while she lay on the floor. She said that the defendant lay down on the floor next to her, pulled her underwear down, and put his finger "in there." She said that his finger was "moving" inside of her underwear, and she demonstrated a circling motion with her finger. She said that the defendant "went back" to his room, then returned to the living room and did the "same thing," meaning, he moved his finger in the same way "in the inside just like the first time." She said that both times that the defendant touched her with his finger, "it kind of hurt. It hurt a lot." After the defendant touched her the second time, he returned to his room, and the victim got off of the floor and laid back down on the couch.

The victim said that the defendant then came back into the living room, and "then he licked it." She explained that while she was lying on the couch, the defendant pulled up the blanket and her nightgown with his hands and pushed her underwear to the side and licked the "side" of her "private." He then pushed her underwear to the other side and licked her again. The victim acknowledged that she did not see anything because she "was acting like I was asleep." She said that she knew that he had licked her twice "because he did separate parts." She said that it felt "messed up." The victim recalled that the defendant asked, "Can I get one more lick?" and that she responded, "No, get away from me you weirdo," at which point, the defendant went to his bedroom, and the victim ran to the "very back" of the laundry room where she hid under a purple towel. She said that the defendant came into the laundry room and told her, "It's OK. Don't be afraid," at which point, the defendant returned to his room, and the victim went back to sleep on the couch, and "he stopped." The victim acknowledged that she did not see the defendant in the

-5-

laundry room but said that she heard his voice.

During cross-examination, Ms. Turner said that the two women whom the victim said had come to talk to her about the incident were DCS employees. She said that it was common during a forensic interview for her to nod her head and repeat back what the child said to her. Ms. Turner said that during the victim's interview, the victim told her that the abuse occurred on a "Saturday or Sunday" and that she had gone to school the week prior and the week after.

On redirect examination, Ms. Turner said that the victim's story was consistent between the two sessions of the interview.

The victim testified that she was nine years old at trial and that her birthday was March 31, 2011. She recalled meeting with Ms. Turner twice at the Carl Perkins Center and acknowledged that she knew her interview sessions were being recorded. She said that in her interview, she told Ms. Turner about something bad that had happened to her while she was at her grandmother's house. She identified the defendant as the person who committed the offenses. She said that what she told Ms. Turner during the interview was the truth.

During cross-examination, the victim said that she watched the video of her recorded interview. She recalled that when she spent the night at her grandmother's house, it was typically on the weekends because she would go home with her grandmother after church. She said that she was sure that the abuse occurred over a weekend. The victim said that she did not remember telling the hospital staff that the abuse occurred over Christmas break. She acknowledged that when the defendant touched her, she could not see his face. She denied that she had learned about inappropriate touching from a school counselor or that she had told anyone else about the abuse before telling her mother.

The victim's grandmother testified that she moved into her three-bedroom house in Munford in August 2018. From that time through December 15, 2018, the defendant and three of her sons lived with her, and she and the defendant shared a bedroom. She said that in late 2018, she saw the victim every two to three weeks and that the victim spent the night with her twice during that period. When she spent the night, the victim slept on a couch in the living room that shared a wall with the victim's grandmother's bedroom.

The victim's grandmother said that she met the defendant in 2015 and that they "dated and eventually lived together off and on for three years." She said that they had "happy times" during their relationship but that "a lot of the time, it was like walking on eggshells," noting that the defendant "drank a lot, and he would be very mean to me

-6-

when he drank, so verbally mean." She said that the defendant drank "[d]aily" other than an occasional two- or three-day break. When the defendant drank, he "would accuse me of cheating on him or doing other things that, to me, were crazy. Pick on my parenting technique, telling me I was soft and my kids were going to turn out not well, because I wasn't a good mother." She said that she routinely took the defendant to and from work and that " if I didn't stop when he wanted to for a beer. He would basically nag me all the way home or until I stopped." She acknowledged that the defendant drank when the victim was at the house. She and the defendant separated on December 15, 2018, and the defendant moved out of her house.

The victim's grandmother said that she had a personal Facebook account and acknowledged that on November 28, 2018, she posted a picture of the victim and her two youngest sons to her Facebook page. The caption to the photograph said: "'These pieces of my heart painted some Christmas ornaments over the weekend. This weekend we decorate #falalalala.'" She said that the photograph was taken the weekend before November 28 at her house.

During cross-examination, the victim's grandmother clarified that although she and the defendant had periods of separation in their relationship, he lived with her continually from October 1 to December 15, 2018.

Bert Zickefoose, a detective with the Munford Police Department, testified that he investigated this case. He said that he did not speak with the victim but that he spoke with her mother and grandmother after the forensic interview. He and another detective interviewed the defendant in May 2019, which interview was audio and video recorded.

The recording of the defendant's interview was exhibited to Detective Zickefoose's testimony and played for the jury. During the interview, the defendant said that the victim would stay overnight at the house that he shared with her grandmother occasionally on Saturday nights and go to church with her grandmother on Sunday mornings. On those nights, the victim slept on the couch. He acknowledged that he drank when the victim was at the house but said that he would drink in the garage area or away from the kids. The defendant said that as far as he knew, the victim typically slept through the night when she was there. He said that the victim's grandmother would give the victim a bath and put her to bed on the couch and that he did not have anything to do with that routine. He said that after the victim went to bed on the couch, he usually watched television in the bedroom that he shared with the victim's grandmother. He said that sometimes the victim's grandmother's youngest son would get in bed with him to watch television and snuggle with his head on the defendant's chest but that other than an occasional hug, the victim did not cuddle with him. He said that the victim did not have

any special attachment to him other than "a normal kid attachment."

When Detective Zickefoose told the defendant that the victim had alleged that she had had some "encounters" with the defendant, the defendant said that he was "not a pervert" and had never done or said anything inappropriate to the victim. The defendant said that he would never "in my right mind" touch a child. He acknowledged that on occasion, he drank to the point that he could not remember all of the events of the night before. He said that "in my heart, never would I ever mess with a child" but that if "I'm totally drunk and I don't know what I'm doing, then I could say I could, not knowing that I did it." As an example, he said that on one occasion, after getting drunk and falling asleep, two of the victim's grandmother's sons said that they walked into the defendant's bedroom and saw him "playing with myself." He said that when the victim's grandmother woke him up and told him what had happened, he had no recollection of the incident because he had been drinking. He said that he had no memory of doing anything to the victim and reiterated that he knew that he had not done anything to her while in his "right mind." "I can't say I wasn't drunk, super blacked out . . . or something." He acknowledged that the victim had never lied other than telling "a little fib" to get candy or to get to play outside. He said that "if something did happen with [the victim] from me, it was not consciously; it was my drunk . . . out of mind" self.

During cross-examination, Detective Zickefoose testified that he was present during the victim's forensic interview but acknowledged that he had not interviewed the victim himself. He said that the defendant came to the police station voluntarily and spoke with the detective. The defendant was not arrested at that point.

The State rested. After a *Momon* colloquy, the defendant elected not to testify but put on proof in the form of the victim's medical records.

The jury accredited the State's evidence and convicted the defendant as charged of one count of rape of a child and one count of aggravated sexual battery. After a sentencing hearing but before setting the sentences on the separate convictions, the trial court merged the two offenses, finding that aggravated sexual battery was a lesser included offense of rape of a child and that the two acts for which the defendant was convicted were "part of one event" on a single date. The trial court sentenced the defendant as a Range II offender to 25 years' incarceration to be served at 100% by operation of law.

The defendant filed a timely but unsuccessful motion for new trial. In this timely appeal, the defendant argues that the evidence was insufficient to support his convictions. The State cross appeals, arguing that the trial court erred by merging the offenses.

*I. Sufficiency*

The defendant contends that the State failed to present sufficient evidence to support his convictions. The State disagrees.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2018). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . ." *Id.* § 39-13-501(7). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4).

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . .

*Id.* § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* § 39-13-501(2).

The defendant argues that the evidence was insufficient because certain inconsistencies in the evidence rendered the victim's testimony incredible and

-9-

untrustworthy. Witness credibility, however, falls within the sole purview of the jury as the trier of fact. *See Cabbage*, 571 S.W.2d at 835.

The evidence adduced at trial established that the victim spent the night at her grandmother's house sometime between Thanksgiving and December 15, 2018. The victim was sleeping on the couch in the living room and fell off the couch onto the floor. She lay on the floor covered with a blanket and pretended to be asleep when the defendant came out of the room that he shared with the victim's grandmother, got down on the floor next to the victim, and placed a finger inside of the victim's vagina. He moved his finger around in a circular motion, causing the victim pain. The defendant returned to his room, then came back into the living room and again inserted his finger into the victim's vagina a second time. After the defendant returned to his room, the victim laid back down on the couch. The defendant came back into the living room, pulled up the victim's nightgown and the blanket that she was under, moved her underwear to the side and licked her genitals twice. When he asked the victim for "one more lick," she told him "No, get away from me you weirdo," and ran to hide under a towel in the laundry room. The defendant came into the laundry room and told the victim to not be afraid, then went back to his room. Although the defendant maintained that he did not commit the charged offenses, he acknowledged that he had a drinking problem and that he would, on occasion, black out and not remember his actions. He acknowledged that it was possible that he abused the victim while in a drunken stupor and that he was unable to recall his actions. This evidence sufficiently supports the jury's verdict.

## *II. Merger*

The State argues that the trial court erred by merging the defendant's conviction of aggravated sexual battery into his conviction for rape of a child. The defendant did not address the issue.

"It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness." *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V; Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the double

jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument."). The United States Supreme Court has observed of the double jeopardy clause:

> Our cases have recognized that the Clause embodies two vitally important interests. The first is the "deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." The second interest is the preservation of "the finality of judgments."

*Yeager v. United States*, 557 U.S. 110, 117-18 (2009) (citations omitted). To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

"[I]n single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized." *Id.* at 542. Claims of this type "ordinarily fall into one of two categories, frequently referred to as 'unit-of-prosecution' and 'multiple description' claims." *Id.* at 543. So-called "[m]ultiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under *different* statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" *Id.* Our inquiry "for determining whether a double jeopardy violation may have occurred in a multiple description case" begins with determining "whether the alleged statutory violations arise from 'the same act or transaction,'" because "[w]hen a court determines that separate convictions do not arise from the same act or transaction, then there cannot be a double jeopardy violation." *State v. Itzol-Deleon*, 537 S.W.3d 434, 441-42 (Tenn. 2017) (quoting *Watkins*, 362 S.W.3d at 545) (internal citations omitted). "Relevant considerations in this inquiry include the charging instrument, the statutory provisions at issue, and 'whether the charges arise from discrete acts or involve multiple victims.'" *Id.* at 442 (quoting *Watkins*, 362 S.W.3d at 556). In cases involving an election of offenses, the State's election may also be a relevant consideration.

-11-

Our supreme court has identified the following list of non-exclusive factors to aid our determination whether a defendant's multiple convictions arise from the same act or transaction in a "multiple description case involving a single victim":

> 1. The nature of the defendant's actions that are alleged to be in violation of the various statutes . . . ;
>
> 2. The temporal proximity between the defendant's actions;
>
> 3. The spatial proximity of the physical locations in which the defendant's actions took place;
>
> 4. Whether the defendant's actions contacted different intimate areas of the victim's body and the degree of proximity of those areas to each other;
>
> 5. Whether the defendant's contact with different intimate areas of the victim's body was deliberate or merely incidental to facilitating contact with another intimate area;
>
> 6. Whether the defendant deliberately used different parts of his body (or objects) to assault the victim sexually;
>
> 7. Whether the defendant's assault was interrupted by some event, giving him an opportunity to either cease his assault or re-form a subsequent intent to commit a subsequent assault;
>
> 8. Indications of the defendant's intent to commit one or more than one sexual assault on the victim; and
>
> 9. The extent to which any of the defendant's actions were merely ancillary to, prefatory to, or congruent with, any of his other actions, thereby indicating unitary conduct.

*Id.* at 451-52 ("The presence or absence of any one or more particular factors is not determinative.").

As stated above, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2018). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or

any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . ." *Id.* § 39-13-501(7). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4).

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . .

*Id.* § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* § 39-13-501(2).

> Here, the indictment charged in Count one that the defendant,

> between October 1, 2018, and December 15[1], 2018, in Tipton County, Tennessee, and before the finding of this indictment, did unlawfully, feloniously, and knowingly sexually penetrate [the victim], date of birth March 31, 2011, who is more than three (3) years of age but less than thirteen (13) years of age, in violation of T.C.A 39-13-522, against the peace and dignity of the State of Tennessee.

> In count two, the indictment charged that

> in Tipton County, between October 1, 2018, and December 15, 2018, before the finding of this indictment, the said [defendant], did unlawfully, feloniously, and knowingly engage in sexual contact with [the victim], date of birth March 31, 2011, a child less than thirteen (13) years of age, in violation of T.C.A 39-13-504(a)(4), against the peace and dignity of the State of Tennessee.

> During closing arguments, the State made the following election of offenses: "The State submits on the rape of a child, . . . . [t]he minute, the second his fingers entered

---

[1] The original date in each charge of the indictment read "December 31, 2018," but in each instance, the "31" is marked out replaced with "15."

-13-

her vagina, he raped her. Aggravated sexual battery, the State submits is the oral contact he made when he licked her vagina twice." The trial court's instructions to the jury are not included in the record on appeal. After the sentencing hearing, the State moved the trial court to reconsider sentencing, arguing that the State made a proper election of offenses and that the convictions should not have been merged.

In our view, the two instances of contact alleged by the State—the digital penetration and the cunnilingus—did not arise from the same act. The two incidents did not occur simultaneously, and the defendant's actions connote that he committed each act deliberately and that one was not merely incidental to the other. When the defendant digitally penetrated the victim, he lay down on the floor next to her and pulled her underwear down. He then got up off of the floor and returned to his bedroom, at which time, the victim moved from the floor to the couch. The defendant then returned to the living room and positioned his body next to the couch where the victim lay. He removed the blanket from her, pulled up her nightgown, pulled her underwear to the side, and licked her. Between the two instances, the defendant repositioned his body, manipulated the victim's clothing in different ways, and used different parts of his body to accomplish each incident. Moreover, he had an opportunity to stop the assault or to form an intent to commit a subsequent assault when he left the living room and went to his bedroom.

That aggravated sexual battery is a lesser included offense of rape of a child, *see Itzol-Deleon*, 537 S.W.3d at 452 (citing *State v. Howard*, 504 S.W.3d 260, 273 (Tenn. 2016)), alone does not necessitate merger of the two convictions. Merger is necessary only when the conduct giving rise to the two convictions arose from the same act or transaction. *See id.* at 451-52 ("[I]f our determination of the threshold inquiry is that the [d]efendant's two convictions arose from the same act or transaction, we next must consider the statutory elements of the two conviction offenses" (citing *Watkins*, 362 S.W.3d at 557)).

Because the two incidents of conduct alleged by the State constitute separate and distinct actions and did not arise from the same act or transaction and because the State made a proper election of offenses, the principles of double jeopardy are not implicated by the defendant's dual convictions, and, consequently, the trial court erred by merging the defendant's conviction for aggravated sexual battery into his conviction for rape of a child. Because the trial court merged the convictions prior to establishing separate sentences, a new sentencing hearing is required.

Accordingly, we affirm the judgment of the trial court as to the sufficiency of the evidence but reverse the trial court's merging of the offenses and remand the case to the trial court for a new sentencing hearing.

_____
JAMES CURWOOD WITT, JR., JUDGE