IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 6, 2022 Session

# DANNY RAY FRANKS, ET AL. v. ROGER BILBREY, ET AL.

**Appeal from the Chancery Court for Overton County**
**No. 2019-CV-49     Ronald Thurman, Chancellor**

___

### No. M2021-00766-COA-R3-CV

___

This appeal concerns an alleged breach of contract. Danny Ray Franks ("Mr. Franks") and his spouse Angela May Franks ("Ms. Franks") ("Plaintiffs," collectively) hired Roger Bilbrey ("Mr. Bilbrey") and Bilbrey's Construction, Inc. ("Defendants," collectively) to build a "barndominium," a metal building that looks like a barn with a stained-concrete floor, garage, and living quarters. The parties' contract ("the Agreement"), which was drafted by Mr. Bilbrey, provided that work would start immediately and be completed by Thanksgiving of 2018. However, the project was not completed by that date. Some five months later, the project still was unfinished. Plaintiffs then fired Defendants. Plaintiffs sued Defendants in the Chancery Court for Overton County ("the Trial Court") for breach of contract. The Trial Court ruled in Plaintiffs' favor. Defendants appeal. We hold that time was of the essence under the Agreement. We further find that Defendants committed a material breach of the Agreement by failing to timely complete Plaintiffs' barndominium. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Nolan R. Goolsby and Bradford G. Wood, Jr., Cookeville, Tennessee, for the appellants, Roger Bilbrey and Bilbrey's Construction, Inc.

Matthew J. McClanahan, Crossville, Tennessee, for the appellees, Angela May Franks and Danny Ray Franks.

# OPINION

## Background

In July 2019, Plaintiffs sued Defendants in the Trial Court for breach of contract. Plaintiffs alleged that they hired Defendants in May 2018 to construct a "barndominium," a metal building that looks like a barn with a stained-concrete floor, garage, and living quarters. Plaintiffs, who were from Texas, planned to move to Tennessee and live in the barndominium. The original contract price was $140,000. Mr. Bilbrey drafted the Agreement, which was a very basic handwritten contract between the parties. It set out the project's specifications. It also stated "[c]ompletion By Thanksgiving 2018" and "[s]tart im[m]ediately." In their complaint, Plaintiffs alleged as follows, in part:

15. As of the date of this Complaint, the construction is still not completed, and the Plaintiffs have had to expend additional money to hire a different construction company and additional subcontractors to complete the work and make repairs to Bilbrey's work that was completed in an insufficient and negligent manner.
16. Defendants did not construct the barndominium in a good and workmanlike manner but performed the services required of them in a careless, negligent, and unworkmanlike manner.
17. Defendants intentionally breached the contract as set out in *Exhibit B*.
18. Defendants failed to complete construction or negligently constructed including, but not limited to, the following:

   a. failed to install a water heater,
   b. failed to stain the flooring of the barndominium,
   c. failed to complete the installation of the doors and trim work,
   d. failed to complete installation of electrical wires for inspection,
   e. improperly placed smoke detector,
   f. failed to install up-to-code electrical outlets,
   g. failed to install the metal roof properly causing water leaks, and
   h. failed to properly install the refrigerator water valve ($1,000.00 insurance deductible).

19. As a result of the defective and unworkmanlike manner in which the Defendants constructed the barndominium, Plaintiffs have been compelled to hire additional contractors including but not limited to[:] electricians,

-2-

plumbers, roofers, and general construction companies to repair the premises to a working and livable condition.

20. Plaintiffs have expended money for additional materials, labor, insurance deductibles for water leaks caused by the negligent roof installation, and are continuing work to complete the construction as a result of the Defendants' breach and negligence.

21. Plaintiffs' construction and repair of the barndominium continues, and the additional costs to complete construction is ongoing.

22. Due to the Defendants' unnecessary delay and total failure to complete the construction of the Plaintiffs' home, Plaintiffs have incurred additional living expenses for rent and storage of their belongings.

Plaintiffs demanded a judgment against Defendants for restoring and completing the barndominium and consequential damages along with prejudgment interest; judgment for additional living and rental expenses along with prejudgment interest; post-judgment interest; attorney's fees; discretionary costs; and any other general relief deemed appropriate. In August 2019, Defendants filed an answer and counterclaim. In their answer, Defendants asserted the following in response to Plaintiffs' specific allegations:

a. The plaintiffs never supplied the water heater as required by the contract.

b. The plaintiffs changed their minds about the concrete floor, wanted a floating floor installed and hired another contractor to install a floating floor.

c. The doors and trim were never installed by Defendants because Plaintiff Angela May Franks fired Defendants on April 25, 2019 before the barndominium was completed sufficiently to install the doors and trim.

d. The electrical work was never completed by Defendants because Plaintiff Angela May Franks fired Defendants on April 25, 2019 before the barndominium was completed sufficiently to complete the electrical work; the electrical work passed the "rough-in" inspection.

e. The smoke detector was never installed by Defendants because Plaintiff Angela May Franks fired Defendants on April 25, 2019 before the barndominium was completed sufficiently to complete the installation of the smoke detector; the smoke detector passed the "rough-in" inspection.

f. The final electrical outlets was never installed by Defendants because Plaintiff Angela May Franks fired Defendants on April 25, 2019 before the barndominium was completed sufficiently to complete the installation of the final electrical outlets; the electrical outlets passed the "rough-in" inspection.

g. Deny.  The Plaintiff Angela May Franks fired Defendants on April 25, 2019 before there were any holes cut into the metal roof.
h. Deny.

In their counterclaim, Defendants asserted claims of breach of contract and quantum meruit against Plaintiffs.

This case was tried in May 2021.  We review the pertinent testimony, beginning with that of Ms. Franks.  Ms. Franks said that she first heard about Mr. Bilbrey from a man who was doing excavation work for her.  According to Ms. Franks, Mr. Bilbrey told her that he had been constructing metal structure buildings for twenty years.  Ms. Franks told him what she wanted in the house, and Mr. Bilbrey reduced their discussion to a handwritten contract, the Agreement.  The Agreement provides:

1 - 36 x 60 x 9 full[y] insulated w/ double bubble all over. 12 FT x 60 FT. Covered Porches on Front and Back with No concrete.  36 x 40 Living area with Stained Concrete Floors, Standard 6 panel doors, and Drywall, ceilings and walls.  Living quarters Framed per Customer print.  Walls insulated w/ R-13 and ceiling R-30 Blow in.  White vinyl windows.  12 x 8 garage door on shop side[.]  Custome[r] Furnishes all, Fixtures on electrical and plumbing and cabinets and countertops and vanities and tubs and showers.  Completion By Thanksgiving 2018.  Start im[m]ediately.

Ms. Franks also gave Mr. Bilbrey a drawing.  The cost for the project was $140,000.  Plaintiffs wired Mr. Bilbrey $50,000 on May 1, 2018.  Mr. Bilbrey told Ms. Franks that he was very busy and wiring him this sum was the only way he could get Plaintiffs on his schedule.  Ms. Franks understood this to be a "turnkey job," with the house ready for occupancy.  The Agreement was signed on May 9, 2018.  Despite the "[s]tart im[m]ediately" contractual language, work did not begin immediately.  According to pictures a neighbor sent Ms. Franks, work only began in June or July.  Ms. Franks and Mr. Bilbrey also discussed a warranty.  Mr. Bilbrey said that he had to furnish a one-year builder warranty that was "bumper to bumper."

The house was not "dried in"—or sealed off from the outside—until January 2019.  When asked by Ms. Franks about the delays at the time, Mr. Bilbrey said that he had some family problems such as a father-in-law who underwent an amputation.  Mr. Bilbrey also cited the weather.  Ms. Franks moved from Texas to Overton County, Tennessee in March 2019.  She moved in with her neighbors as her house was not yet finished.  Ms. Franks testified that Mr. Bilbrey said he was quitting the project on four different occasions.  She related a litany of flaws in the house and how much she spent to have the work done properly.  Ms. Franks sent Mr. Bilbrey a text message on April 25, 2019 telling him that

she and her husband would find someone else to finish the job. Ms. Franks said that over the course of the job, Mr. Bilbrey cursed at Plaintiffs several times and once said "I wish I never heard of this place[.]"

On cross-examination, Ms. Franks acknowledged that the Agreement required Plaintiffs to provide thousands of dollars in materials for the project. Ms. Franks was pressed on this point, as well as whether she gave Defendants a fair chance to finish the job, as follows:

> Q. Okay. So again the floor wasn't down until early May. You fired him on April 25th. How was he going to finish the project when you said you didn't have any idea why it wasn't finished multiple times to the Court?
> A. I don't know why he didn't have it finished in November, like he was supposed to. You're talking about a flooring --
> Q. No. That's --
> A.-- issue that took 3 months afterwards.
> (Reporter interruption.)
> THE COURT: One at a time.
> MR. GOOLSBY [Defendants' counsel]: I apologize.
> BY MR. GOOLSBY:
> Q. How could he have finished in November when you didn't buy the flooring until end of March of April -- of '19?
> A. How about stained concrete?
> Q. Would you answer my question, please?
> A. How could he --
> Q. He couldn't, could he?
> A. He could not put the trim in until the flooring was complete, that's correct.

> ***

> Q. All right. Did you ask Mr. Bilbrey to not pay him another draw because you did -- you'd used up your funds and you didn't want to get into your retirement or some other excess funds?
> A. The reason I talked to Mr. Bilbrey about that was because he wasn't making enough progress. We had already given him more money than he could've ever spent on that house. We were almost -- we were upside down from what -- the money we gave him. Every time he asked us for money, we gave him money.

On re-direct examination, Ms. Franks testified that she gave Mr. Bilbrey multiple opportunities to correct the various problems with the project before she fired him.

-5-

Mr. Franks testified, as well. Mr. Franks was a truck driver who planned to retire upon moving to Overton County. Mr. Franks largely echoed his wife's testimony. He stated that Mr. Bilbrey once told him "f--- you, old man" in a dispute over the flooring. Mr. Franks cursed back at Mr. Bilbrey.

Mr. Bilbrey also testified. He was questioned extensively regarding whether he had fulfilled his obligations under the Agreement. Mr. Bilbrey testified, in part:

Q. Okay. Well, you put in here that you wanted it -- you would guarantee completion by Thanksgiving of 2018; is that correct?
A. Does it say guaranteed?
Q. It says, "Completion by Thanksgiving 2018."
A. But it don't say "guarantee."
Q. Have you got a copy of it still?
A. I do not. I'm asking you: Does it say "I Guarantee" or does it say "Completion by"?
Q. Well, let me show it to you.
A. "Completion by Thanksgiving 2010 (sic). Start immediately."
Q. 2018.
A. "Completion by Thanksgiving 2018. Start immediately." But you added the word "guaranteed."
Q. Well, did you not -- was it not a guarantee that it would be done by then?
A. No, sir.
Q. Okay. So you just -- why did you put it in there?
A. Because I intended on having the project finished by approximately that time.
Q. Why did you go six months over, then?
A. Probably 50 percent of that was my fault and probably 50 percent of that was their fault. I'm just man enough to admit.
Q. Well, what 50 percent of it was your fault?
A. Well, multiple things. A family emergency; rain, on top of rain, on top of rain, on top of rain; changes made by the Franks that delayed the project. And during all of this time, we were communicating, and -- and you can read all the texts that you choose to leave out that says, Miss Franks, we're behind. We're behind schedule. We've not got as much done as we should. And the responses from the Franks was, It's okay. It's not a big deal. We're going to be okay. You do great work. You do awesome work. It was never, We're mad because you're behind. It was responses from the Franks of saying, Well, it's okay. Our house ain't selling anyway. Everything's going to be

-6-

fine. We know you're behind. We've got lots of rain, references to hurricanes, just on and on and on --

Q. All right. What other projects were you working on at the same time in conjunction with their house?

A. Other projects that I worked on during the day? None.

Q. You weren't building your son's home during this time?

A. Not during the day.

Q. Well, when were you building your son's home?

A. In the evening, in my own time.

***

Q. And you can agree with me that you were over six months behind on the completion date at the time you were let go?

A. Yes, sir.

Q. Do you think it's fair that the Franks would have to pay all these other people to come in and complete this job and eat that cost?

A. If they hadn't have fired me and the changes they had made, they wouldn't have had to.

Q. Well, how long was it going to take you? I mean, it was already April of '19. How much further --

A. We would've been done in two weeks from the morning we started installing the floor.

Q. It took you six months to dry it in.

A. Waiting on weather to get the concrete poured.

In June 2021, the Trial Court entered its final order in which it ruled in favor of Plaintiffs. In its final order, the Trial Court stated:

This cause came to be heard on the 4th day of May, 2021 before the Honorable Ronald Thurman, Chancellor of the Chancery Court for Overton County, Tennessee. During the trial of this matter, the Defendant announced to the Court that it was dismissing any counter-claims that were asserted against the Plaintiffs. The parties stipulated that Roger Bilbrey and Bilbrey's Construction, Inc. were one in the same and that any judgment awarded, if any, would be joint and several against the Defendants. The Court heard testimony from the parties, fact witnesses, and one expert witness, an electrician. Based upon the testimony in this case, the exhibits submitted to the Court, and the arguments of counsel, the Court finds as follows:

There was a breach of contract in this case involving the construction of a barndominium. It is undisputed that exhibit one is a contract to build the

barndominium that was prepared by Mr. Bilbrey. The Court will read the contract against the maker. The terms that are critical to the contract are 1) "start immediately" and 2) "completed by Thanksgiving of 2018."

Looking at the four corners of the contract, it was to be a completed house, with the exception of fixtures, and that Mr. Bilbrey would build a move-in ready house within the shell of this building, but the Franks would provide the fixtures and those items that are specifically set out in the contract. Mr. Bilbrey breached the contract by failing to complete it by Thanksgiving of 2018.

The Court finds that the testimony in this case was differing versions of what each party said to the other concerning stained concrete. Regardless, the Franks acquiesced in putting in a different type of flooring than what was in the contract. Mr. Bilbrey's son testified that he works for his father, and normally, it took them two months to dry in a house. In this case, it was more than six months to dry in the house.

The Court sides with the Plaintiffs in large because the Defendant said that he was covered up and he wanted a $50,000 deposit to begin work on it, yet he also testified here today that he was not working on any other jobs at the time. The Court does not find the Defendant's testimony credible and gives more weight to the Plaintiffs' testimony.

Looking at the breach, the Court finds that the Plaintiffs proved damages as it related to the HVAC bill, plumber charges, electrical charges, Lowes, and carpentry charges. These damages naturally flowed from the breach. The Court finds that the consequential damages including rent, insurance, and food cost were too speculative and declines to award damages related to those items.

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** as follows:

The Plaintiffs are awarded a judgment against the Defendants, Roger Bilbrey, individually and Bilbrey Construction, Inc., for breach of contract in the amount of $32,113.06. The judgment is joint and several as was stipulated by the parties. Statutory post judgment interest shall apply at the current rate of 5.25%. The court cost shall be assessed to the Defendant Roger Bilbrey.

Defendants timely appealed to this Court.

### Discussion

Although not stated exactly as such, Defendants raise the following issue on appeal: whether the Trial Court erred in determining that Defendants committed a material breach of the Agreement. We begin by reviewing the applicable law. In *Madden Phillips Constr.,*

*Inc. v. GGAT Dev. Corp.*, a case both parties cite albeit to different ends, this Court set out the standard of review as follows:

> We review the decision of a trial court in a bench trial *de novo* upon the record, according a presumption of correctness to the factual findings of the court below. Tenn. R.App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We will defer to the factual findings of the trial court unless the preponderance of the evidence is to the contrary. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). Factual determinations based on a trial judge's assessment of witness credibility receive a higher degree of deference. We will not reverse a finding of the trial court based on credibility unless clear and convincing evidence shows the finding to be in error. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Our review is *de novo* with no presumption of correctness if the trial court does not produce findings of fact. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995). We review mixed questions of law and fact *de novo* with no presumption of correctness. *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009). We likewise review pure questions of law *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

*Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 809 (Tenn. Ct. App. 2009). When contractual language is clear, courts must not look beyond the contract's four corners in interpreting it. *Kiser v. Wolfe*, 353 S.W.3d 741, 748 (Tenn. 2011) (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). However, if a contractual provision is found to be ambiguous, the ambiguous provision will be construed against the drafter. *Id.* (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006); *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (Tenn. 1968)). "The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006)).

With respect to "time is of the essence" contractual provisions, this Court has discussed as follows:

> In contracts involving "construction services," such as the one at bar, a party's failure to complete the "project within a time for completion does *not constitute material breach* absent a provision making time of the essence." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 818 (Tenn. 2009) (emphasis added) (citing *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833 (Tenn. Ct. App. 1997)). As this Court has

previously explained, "whether failing to complete performance on time constitutes a material breach depends on whether 'time is of the essence' with respect to the contract." *Groner v. On-Site Grading, Inc.*, No. E1999-00219-COA-R3-CV, 2000 WL 502843, at *4 (Tenn. Ct. App. Apr. 28, 2000). A time of completion clause is not the same as a "time is of the essence" provision. *See Madden Phillips Constr., Inc.*, 315 S.W.3d at 818. Simply agreeing on a date or time of completion, without more, will not establish that time was of the essence in a construction contract. *Sanders v. Breath of Life Christian Church, Inc.*, No. W2010-01801-COA-R3-CV, 2012 WL 114279, at *18 (Tenn. Ct. App. Jan. 13, 2012) (citing *Madden Phillips Constr., Inc.*, 315 S.W.3d at 818).

> A party may prove the existence of a "time is of the essence" provision by "stipulation, a manifestation of intention from the contract or subject matter involved, or an implication from the nature of the contract or circumstances of the case." *Madden Phillips Constr., Inc.*, 315 S.W.3d at 818 (quoting *Groner*, 2000 WL 502843, at *4). *See also Shepherd*, 968 S.W.2d at 833. In determining the existence of a "time is of the essence" provision, the court should look at the entire agreement. *See Claiborne Hauling, LLC v. Wisteria Park, LLC*, No. E2009-02667-COA-R3-CV, 2010 WL 3219467, at *7 (Tenn. Ct. App. Aug. 16, 2010). Tennessee courts have consistently held that, generally, time is *not* of the essence in construction contracts. *See, e.g., Madden Phillips Constr., Inc.*, 315 S.W.3d at 818; *Classic City Mech., Inc. v. Potter S. E., LLC*, No. E2015-01890-COA-R3-CV, 2016 WL 5956616, at *11 (Tenn. Ct. App. Oct. 14, 2016); *Groner*, 2000 WL 502843, at *4; *Shepherd*, 968 S.W.2d at 833.

*Clark v. Givens*, No. M2019-01693-COA-R3-CV, 2020 WL 4382247, at *4 (Tenn. Ct. App. July 30, 2020), *no appl. perm. appeal filed*.

In *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917 (Tenn. Ct. App. 1997), this Court noted that in order for a contractual breach to be sufficient to relieve the non-breaching party of its contractual obligations, the initial breach must be "material." In *Adams TV*, we affirmed the trial court's dismissal of a breach of contract claim because the alleged breach was not material. In so doing, we stated:

> Upon consideration of the motions to dismiss, the trial court found, and we agree, that any breach of the terms of the Adams TV—ComCorp contract was not a material breach so as to warrant non-performance of the contract by Adams TV. In determining whether a breach of contract is material such that the non-breaching party could avoid performance,

Tennessee courts have adopted the criteria established in the Restatement (Second) of Contracts, § 241 (1981), which enumerates the following factors to consider:

> (1) The extent to which the injured party will be deprived of the expected benefit of his contract;
>
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

See, *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. App. 1990).

*Adams TV*, 969 S.W.2d at 921.

Under Defendants' sole issue, we first address whether the Agreement is a "time is of the essence" contract.[1] Defendants argue that it is not. Defendants correctly state Tennessee law to the effect that a completion date in a construction contract does not, by itself, make time of the essence. They point out that the Agreement contains no explicit provision making time of the essence. However, we look to the entire Agreement to determine whether time was of the essence. The Agreement contains not only a completion date—Thanksgiving of 2018—but also the language "[s]tart im[m]ediately." These words are to be afforded their plain and natural meaning. While Defendants are correct in that a completion date alone does not make time of the essence, the addition of "[s]tart im[m]ediately" reflects additional importance attached to completion of the project by a fixed date. If the completion date is a mere rough estimate, there is no necessity of starting

---

[1] Plaintiffs point out other bases for Defendants' alleged breach of the Agreement, such as continual delays, poor workmanship, and breach of warranty. The Trial Court also referenced certain damages beyond Defendants' failure to complete the project in time. However, we conclude that the sole dispositive basis for Defendants' breach of the Agreement is untimeliness in completion. That is what ultimately is at issue.

immediately and the importance of a set starting date is diminished or eliminated. Here there is not just a time of completion in the Agreement. There is more in the Agreement because it also requires construction to "[s]tart im[m]ediately." We are to give effect to the Agreement's plain terms, not vitiate them. To the extent the Agreement is ambiguous, we construe any ambiguity against its drafter, Mr. Bilbrey. Although the Agreement lacks an explicit "time is of the essence" provision, we conclude that a natural and unstrained reading of the entire Agreement reveals it to be a "time is of the essence" contract.

Having concluded that time was of the essence under the Agreement, we consider whether Defendants materially breached the Agreement by failing to complete Plaintiffs' barndominium by Thanksgiving of 2018.[2] For their part, Defendants argue that Plaintiffs terminated them before they had a chance to complete the project. Defendants contend that they were denied an opportunity to cure any defects. They contend further that Plaintiffs failed to pay for the necessary construction materials and, at any rate, did not even close on their house in Texas until March 2019. In response, Plaintiffs state that they paid Defendants over $100,000 and the project still went unfinished. Plaintiffs also note the Trial Court's credibility findings. Plaintiffs state that all they wanted "was a complete home, as promised by [Defendants] … that would be ready for them, first by Thanksgiving 2018, then by the time they moved from Texas to Tennessee. … [T]hey continued to work with him and hear his excuses for five months after the project should have been completed."

The Trial Court found that "Mr. Bilbrey breached the contract by failing to complete it by Thanksgiving of 2018." The evidence does not preponderate against this or any of the Trial Court's factual findings. As was its prerogative, the Trial Court did not credit Mr. Bilbrey's excuses for why he was unable to finish the job on time. By contrast, the Trial Court credited Plaintiffs' testimony. We find no clear and convincing evidence in this record that would serve to overturn the Trial Court's credibility determinations. To the extent Defendants assert that they were denied an opportunity to cure any defects, the dispositive "defect" at issue was untimeliness, which Defendants could not cure after the time limit for completion elapsed. Defendants make much of the fact that Plaintiffs did not fire them right away when the project was not finished by Thanksgiving of 2018. However, that Plaintiffs did not fire Defendants right away when under the Agreement they could have done so does not mean that Defendants were entitled to put off finishing the project indefinitely. Defendants' position appears to be that they could unilaterally determine when, if ever, to finish Plaintiffs' barndominium—that not only was time not of the essence, it was not a consideration at all. Defendants are mistaken.

---

[2] Defendants ask us to disregard certain deposition testimony of Mr. Bilbrey which Plaintiffs cite in their brief but is not found in the appellate record. We agree with Defendants on this point. We confine our review exclusively to that which is contained in the appellate record.

-12-

Even if we err in our determination that time is of the essence under the Agreement, Defendants had to finish the job sometime. For Plaintiffs, completion of the barndominium was the whole point of the Agreement. Failure to complete the barndominium deprived Plaintiffs of their expected benefit under the Agreement. There comes a point in time when, even in a construction contract that is not a time is of the essence contract, the builder's unjustified delay becomes a material breach. Under the Agreement, construction was to take approximately six months. It was roughly another five months past the stated completion date when Plaintiffs fired Defendants. While Tennessee caselaw is clear that time generally is not of the essence in construction contracts, a builder does not have forever in which to complete a project. A builder's significant, indefinite, and unjustified delay is tantamount to not performing under a construction contract and may well constitute a material breach.

In sum, we hold that time was of the essence under the Agreement. Defendants' failure to complete the barndominium by Thanksgiving of 2018 constituted a material breach of the Agreement. However, even if time were not of the essence, Defendants' significant unjustified delay and failure to complete the barndominium after eleven months constituted a material breach of the Agreement. To hold otherwise would make such a contract illusory as the contractor would have no obligation under the contract to complete his work. On the other hand, Plaintiffs committed no breach of the Agreement in firing Defendants when they did; they did not have to wait on Defendants forever. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Roger Bilbrey and Bilbrey's Construction, Inc., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE